[No. S002882. Nov. 23, 1988.]

WALTER J. NALLY et al., Plaintiffs and Appellants, v.
GRACE COMMUNITY CHURCH OF THE VALLEY et al.,
Defendants and Respondents.

COUNSEL

Edward Barker and Allen P. Wilkinson for Plaintiffs and Appellants.

Michael Norman Saleman as Amicus Curiae on behalf of Plaintiffs and Appellants.

Cooksey, Howard, Martin & Tolen, Cooksey, Coleman & Howard, David R. Cooksey, Jon A. Hammerbeck, Samuel E. Ericsson, Michael Stokes Paulsen, Rex E. Lee, Gene C. Schaerr and Sidley & Austin for Defendants and Respondents.

Robert R. Thompson, Gerald R. Thompson, Richard A. Moore, David L. Llewellyn, Jr., Caldwell & Toms, Robert L. Toms, Dennis R. Kasper, Edward McGlynn Gaffney, Jr., Douglas Laycock, Wendell R. Bird, Fry, Joens & Fry, Timothy L. Joens, Ronald B. Pierce, Sarah Barringer Gordon, Fine, Kaplan & Black, Ronald A. Zumbrun, Anthony T. Caso, Timothy A. Bittle, Wilford W. Kirton, Jr., Oscar W. McConkie, Jr., Kirton, McConkie & Bushnell, Charles S. Vogel, Lori H. Dillman and Dennis A. Ragen as Amici Curiae on behalf of Defendants and Respondents.

Peter M. Shannon, Jr., Erin B. Isaacson and Keck, Mahin & Cate as Amici Curiae.

**OPINION**

**LUCAS, C. J.—**

## I. INTRODUCTION

On April 1, 1979, 24-year-old Kenneth Nally (hereafter Nally) committed suicide by shooting himself in the head with a shotgun. His parents (hereafter plaintiffs) filed a wrongful death action against Grace Community Church of the Valley (hereafter Church), a Protestant Christian congregation located in Sun Valley, California, and four Church pastors: MacArthur, Thomson, Cory and Rea (hereafter collectively referred to as defendants), alleging "clergyman malpractice," i.e., negligence and outrageous conduct in failing to prevent the suicide. (See Code Civ. Proc., § 377.) Nally, a member of the Church since 1974, had participated in defendants' pastoral counseling programs prior to his death.

This case was previously before us in 1984 after the Court of Appeal reversed summary judgment for defendants and remanded to the trial court (hereafter *Nally I*). After we denied a hearing and depublished the *Nally I* Court of Appeal opinion, the matter was sent back to the trial court. At the close of plaintiffs' evidence at the trial on remand, the court granted defendants' motion for nonsuit on all counts on the basis of insufficiency of the evidence.[1]

The Court of Appeal again reversed and we granted review to address: (i) whether we should impose a duty on defendants and other "nontherapist counselors" (i.e., persons other than licensed psychotherapists, who counsel others concerning their emotional and spiritual problems) to refer persons to licensed mental health professionals once suicide becomes a foreseeable risk, and (ii) whether the evidence presented at trial supports plaintiffs' cause of action for wrongful death based on defendants' alleged "intentional infliction of emotional distress" on Nally.

## II. FACTS

### A. Background

In 1973, while attending University of California at Los Angeles (hereafter UCLA), Nally became depressed after breaking up with his girlfriend.

---

[1] Code of Civil Procedure section 581c provides in relevant part: "(a) After the plaintiff has completed his or her opening statement, or the presentation of his or her evidence in a trial by jury, the defendant, without waiving his right to offer evidence in the event the motion is not granted, may move for a judgment of nonsuit. . . . [¶] (c) If the motion is granted, unless the court in its order for judgment otherwise specifies, the judgment of nonsuit operates as an adjudication upon the merits."

He often talked about the absurdity of life, the problems he had with women and his family, and he occasionally mentioned suicide to his friends. Though Nally had been raised in a Roman Catholic household, he converted to Protestantism while he was a student at UCLA, and in 1974 he began attending the Church, the largest Protestant church in Los Angeles County. Nally's conversion became a source of controversy between him and his family. During this time, Nally developed a close friendship with defendant Pastor Cory, who was responsible for overseeing the ministry to the collegians attending the Church. On occasion, Nally discussed his problems with Cory, but the two never established a formal counseling relationship. Between 1974 and 1979, Nally was active in defendants' various Church programs and ministries.

Defendants offered pastoral counseling to church members in matters of faith, doctrine and the application of Christian principles. During 1979, defendant Church had approximately 30 counselors on its staff, serving a congregation of more than 10,000 persons. Defendants taught that the Bible is the fundamental Word of God containing truths that must govern Christians in their relationship with God and the world at large, and in their own personal lives. Defendant Church had no professional or clinical counseling ministry, and its pastoral counseling was essentially religious in nature. Such counseling was often received through instruction, study, prayer and guidance, and through mentoring relationships called "discipleships." According to the trial testimony of defendant Senior Pastor MacArthur, "Grace Community Church does not have a professional or clinical counseling ministry. We don't run a counseling center as such. We aren't paid for that, and we don't solicit that. We just respond as pastors, so what we do is on a spiritual level, and a biblical level, or a prayer level . . . ." In essence, defendants held themselves out as *pastoral* counselors able to deal with a variety of problems—not as professional, medical or psychiatric counselors.

In 1975, Nally was seeing a secular psychologist to discuss problems he was having with his girlfriend. After graduating from UCLA in 1976, he spent one semester at Biola College in La Mirada and was enrolled in the Talbot Theological Seminary's extension on defendants' church grounds. During this time, Nally became involved in a relationship with a girlfriend who was a fellow Bible student. In January 1978, he established a "discipling relationship" with Pastor Rea with whom he often discussed girlfriend and family problems. They met five times in early 1978, but when Nally lost interest in "discipling," the meetings were discontinued.[2]

---

[2] Contrary to statements in Justice Kaufman's concurrence, our review of the record reveals that Rea did not become aware Nally could not cope in the *physical* sense until *after* his suicide attempt. Indeed, the record, when viewed in context, shows that when Nally told

Following the breakup with his girlfriend in December 1978, Nally became increasingly despondent. Pastor Cory encouraged him to seek the counsel of either Pastor Thomson or Rea. The friendship with Cory and the five discipling sessions with Rea in early 1978, constituted the full extent of the "counseling" Nally received from defendants before the spring of 1979.

In February 1979, Nally told his mother he could not "cope." She arranged for him to see Dr. Milestone, a general practitioner, who prescribed Elavil, a strong antidepressant drug, to relieve his depression. Milestone also recommended Nally undergo a series of blood and chemical tests. The record reveals that Milestone never referred Nally to a psychiatrist.

By late February, Nally's depression did not appear to be subsiding, and he was examined by Dr. Oda, a physician, who did not prescribe medication or refer Nally to a psychiatrist, but suggested he undergo a physical examination. Shortly thereafter, Nally spoke briefly in a drop-in counseling session with Pastor Thomson about the marital tensions between his parents and his problems with his current girlfriend. He told Thomson that he considered suicide in 1974 while a student at UCLA.[3] The record shows that Thomson's conversation with Nally focused on their common faith in scripture. During this time, Nally "decided to serve the Lord through law," and was accepted at a Southern California law school for the 1979 fall semester.

B. *The Events Preceding Nally's Suicide*

On March 11, 1979, Nally took an overdose of the antidepressant prescribed by Dr. Milestone. Plaintiffs found him the following day and rushed him to a hospital. At the hospital, Dr. Evelyn, Nally's attending physician, advised plaintiffs that because their son "was actually suicidal," she could not authorize his release from the hospital until he had seen a psychiatrist. The record indicates that plaintiffs, concerned about their friends' reactions to their son's suicide attempt, asked Dr. Evelyn to inform other persons that Nally had been hospitalized only for the aspiration pneumonia he suffered after the drug overdose rendered him unconscious.

On the afternoon of March 12, Pastors MacArthur and Rea visited Nally at the hospital. Nally, who was still drowsy from the drug overdose,

---

Pastor Rea that he "could not cope" and just could not "live this life," he was referring to leading the "*Christian* life."

[3] Although Thomson recalled that Nally mentioned he had considered suicide while a student at UCLA, and concluded there was a "vague possibility" that Nally could consider suicide in the future, he did not believe Nally's "intimation of suicide" gave rise to a "serious enough likelihood where other help would be needed at [that] point."

separately told both pastors that he was sorry he did not succeed in committing suicide. Apparently, MacArthur and Rea assumed the entire hospital staff was aware of Nally's unstable mental condition, and they did not discuss Nally's death-wish comment with anyone else.

Four days later, Dr. Hall, a staff psychiatrist at the hospital, examined Nally and recommended he commit himself to a psychiatric hospital. When both Nally and his father expressed reluctance at the thought of formal commitment, Hall agreed to release Nally for outpatient treatment, but warned Nally's father that it would not be unusual for a suicidal patient to repeat his suicide attempt. Nally was released from the hospital by Drs. Hall and Evelyn the next day.

On his release from the hospital on March 17, 1979, Nally arranged to stay with Pastor MacArthur, because he did not want to return home. MacArthur encouraged Nally to keep his appointments with Dr. Hall, and arranged for him to see Dr. John Parker, a physician and Church deacon, for a physical examination. Parker's testimony reveals that Nally told him he was depressed, had entertained thoughts of suicide, and had recently taken an overdose of Elavil. After examining Nally, Parker believed he was a continuing threat to himself, and recommended Nally commit himself to a psychiatric hospital. Nally, however, immediately rejected the advice.

Parker testified that after Nally left his office, he telephoned Glendale Adventist Hospital to determine whether any beds were available. He then informed Nally's father that Nally needed acute psychiatric care and that he should contact Glendale Adventist Hospital for information concerning the psychiatric facilities. That same evening, Nally's father telephoned Dr. Hall and told him that Parker had recommended psychiatric hospitalization. Hall offered to come to the Nally residence and arrange for Nally's involuntary commitment; the offer was rejected by plaintiffs. The record shows that Mrs. Nally strongly opposed psychiatric hospitalization for her son, saying, "no, that's a crazy hospital. He's not crazy."

Eleven days before his suicide, Nally met with Pastor Thomson for spiritual counseling. According to the record, Nally asked Thomson whether Christians who commit suicide would nonetheless be "saved." Thomson referred Nally to his training as a seminary student and acknowledged "a person who is once saved is always saved," but told Nally that "it would be wrong to be thinking in such terms." Following their discussion, Thomson made an appointment for Nally to see Dr. Bullock for a physical examination but did not refer Nally to a psychiatrist.

Several days later, Nally moved back home. During his final week of life, he was examined separately by Drs. Bullock and Evelyn. Dr. Bullock tes-

tified that he was concerned with Nally's physical symptoms. (Nally complained of headaches and of the fact that his arm was paralyzed because he had slept on it while he was unconscious following the Elavil overdose.) Bullock suggested to Nally that he admit himself to the hospital. Bullock, however, did not refer Nally to a psychiatrist; instead, he subsequently conferred with Dr. Evelyn, and both doctors agreed Nally needed further physical and possibly psychiatric evaluation.

The day after his visit with Bullock, Nally encountered Pastor Thomson in the Church parking lot. Nally told Thomson that he was thinking of seeing a psychologist. Thomson recommended Nally contact Dr. Mohline, director of the Rosemead Graduate School of Professional Psychology. The following day, Nally spent approximately 90 minutes with Mohline, who in turn referred him to the Fullerton Psychological Clinic. Nally and his father went to the clinic the next day, and Nally discussed possible therapy with Mr. Raup, a registered psychologist's assistant. Raup testified he believed that Nally was "shopping for a therapist or counselor or psychologist" and that he was not going to return to the clinic. At the end of the week, Nally met with a former girlfriend. She turned down an apparent marriage proposal by telling Nally, "I can't marry you when you are like this. You have got to pull yourself together. You have got to put God first in your life." The next day, Nally left plaintiffs' home following a family disagreement. Two days later, he was found in a friend's apartment, dead of a self-inflicted gunshot wound.

## III. PROCEDURAL BACKGROUND

### A. *Allegations of the Complaint*

As stated above, the *Nally I* Court of Appeal reversed, in a published opinion, a summary judgment for defendants. In the first two counts of the complaint, alleging wrongful death based on "clergyman malpractice" and negligence, plaintiffs asserted that defendant Church was negligent in the training, selection and hiring of its spiritual counselors. Plaintiffs also claimed that following Nally's suicide attempt by drug overdose, defendants failed to make themselves available to Nally for counseling and "actively and affirmatively dissuaded and discouraged [Nally] from seeking further professional psychological and/or psychiatric care."

The third count incorporated the negligence allegations by reference and charged defendants with outrageous conduct for teaching certain Protestant religious doctrines that conflicted with Nally's Catholic upbringing and which "otherwise exacerbated" Nally's "pre-existing feelings of guilt, anxiety and depression." (In this context, plaintiffs claimed one of the defendants

told Nally that his temporarily paralyzed arm caused by his suicide attempt was "God punishing him" for his sin.) Plaintiffs also alleged that defendants' conduct in counseling Nally was outrageous because they "taught or otherwise imbued [Nally], whom they knew to be depressed and having entertained suicidal thoughts, with the notion that if he had accepted Jesus Christ as his personal savior, [he] would still be accepted into heaven if he committed suicide." Here, plaintiffs relied on Thomson's statement to Nally 11 days before his suicide that one who is saved is "always saved," and on a short passage taken from a 12-part tape-recorded series, entitled "Rich Thomson: Principles of Biblical Counseling," that was a recording of Pastor Thomson's 1980 classroom lectures to seminary students.

The tape-recorded passage was recorded 18 months *after* Nally's suicide and stated, in pertinent part: "And the suicidal says, 'I am under such tremendous pressure, now I've got to have pleasure of release! Now! I don't care about the future! That's characteristic of human nature. So it is very characteristic of the suicidal that it is his fear of judgment that drives him into the death after which he will face that judgment, if he's an unbeliever. And after which, if he is a believer, he'll go to be with the Lord. . . .'"

B. *Procedural History*

After considering the above evidence, the trial court granted summary judgment on the basis that plaintiffs had failed to raise a triable issue of fact. The trial court stated at the time of the ruling, "Religion has nothing to do with this case."

Although the Court of Appeal in *Nally I* reversed the summary judgment, it did not separately discuss the first two counts alleging "clergyman malpractice" and negligence, but instead focused on the third cause of action for wrongful death based on intentional infliction of emotional distress. The court held the third cause of action was adequately pleaded and triable issues of fact remained as to whether Nally's suicide was caused by defendants' allegedly outrageous conduct. It based reversal on (i) a declaration of Nally's father that after Nally's hospitalization in March 1979, he opened Pastor Cory's office door during one of the pastor's counseling sessions with Nally and found Nally on his knees crying and (ii) on the deposition testimony of Pastor MacArthur that spiritual counseling (such as he gave Nally) could potentially cause "the deepest depression." In addition, the court relied on the tape excerpt, quoted in part above, as raising a reasonable inference defendants followed a policy of counseling suicidal persons that suicide was an acceptable alternative to living. The *Nally I* court rejected defendants' First Amendment defense to the admissibility of the tape—that the free exercise of religion clause forbids imposing

liability merely because a church teaches suicide does not lead to eternal damnation.

Following the Court of Appeal's decision in *Nally I,* defendants petitioned this court for review. We denied review and depublished the opinion. The case was returned to the trial court.

At trial after remand, four experts testified for plaintiffs regarding the general standard of care to be followed by the counseling community when dealing with a suicidal individual. Each witness testified that although standards varied among secular and denominational counselors, a counselor has a duty to investigate the counseled person's suicidal tendencies and to encourage that person to seek professional help once suicide becomes foreseeable. Although plaintiffs attempted to show that defendants violated these standards, the suggested standards are vague and dependent on the personal predilections of the individual counselor or denomination, and not officially or formally adopted by any organized body of counselors.[4]

Plaintiffs introduced several counseling manuals that were apparently sold in the Church bookstore as supporting an inference that defendants advertised that its counselors were competent to treat a myriad of emotional problems, and as evidence of defendants' inadequate training as counselors. The manuals, however, while advocating "If a problem is not organically caused . . . the counselor can, with full assurance look to God's Word for its proper solution," do not appear to have presented defendants as anything other than pastoral counselors.

In ruling on the nonsuit motion, the trial court noted that Nally voluntarily sought defendants' counsel and that the court had no compelling reason to interfere in defendants' pastoral activities. The court stated: "There is no compelling state interest to climb the wall of separation of church [and state] and plunge into the pit on the other side that certainly has no bottom." The court also found that even if the law were to impose a "duty to refer," as urged by plaintiffs, the evidence failed as a matter of law to show a breach of such duties and also failed as a matter of law, to prove that defendants' conduct was the proximate cause of Nally's death. Moreover, the court excluded, under Evidence Code section 352,[5] the tape-recorded

---

[4] The trial court refused to allow a witness from the American Pastoral Counseling Association to testify about the standards of care imposed by the association on member counselors. The court noted that defendants did not belong to the association, and that the group had not been accepted by the general pastoral counseling community as experts in the field of pastoral counseling. In any event, the record fails to indicate that defendants violated the foregoing unofficial rules of conduct.

[5] Section 352 provides, "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate

excerpt from Pastor Thomson's lecture series that *Nally I* had deemed essential to sustain the third count. In excluding the evidence, the trial court specifically stated that consideration of the tape would not have affected its ultimate finding.

The Court of Appeal again reversed, holding that although the "clergyman malpractice" count failed to state a cause of action separate from the "negligence" count, both could be construed as stating a cause of action for the "negligent failure to prevent suicide" by "nontherapist counselors." In this context, the Court of Appeal held that nontherapist counselors—*both religious and secular*—have a duty to refer suicidal persons to psychiatrists or psychotherapists qualified to prevent suicides. Moreover, the court held, imposition of a negligence standard of care on pastoral counselors does not impinge on the free exercise of religion guaranteed by the First Amendment, because the state's compelling interest in the preservation of life justifies the narrowly tailored burden on religious expression imposed by such tort liability. Although the Court of Appeal found "the evidence sufficient to sustain a finding [defendant] Church negligently breached its duty to train its counselees in their responsibilities to refer suicidal counselors or to otherwise insure they were aware of the responsibilities . . . ," the court also found that there existed "sufficient evidence in the record for a reasonable person to have concluded some or all of [defendants'] counselors actually exercised reasonable care in attempting to refer [Nally] to mental health professionals authorized and equipped to prevent an imminent suicide."

The Court of Appeal also concluded that the trial court's grant of nonsuit for insufficiency of the evidence flowed from its erroneous exclusion of the tape-recorded excerpt in which Pastor Thomson discussed his view of suicide and salvation. The court determined that evidence of Thomson's "religious belief" was "highly probative" of his past state of mind and an indication of the content of the religious counseling he *may* have given Nally. The majority rejected defendants' First Amendment defenses to intentional tort liability, claiming that under the law-of-the-case doctrine, *Nally I* was dispositive on whether the First Amendment would operate to relieve defendants of liability.

Justice Cole dissented, asserting that the majority's holding rested on broad policy determinations best left to the Legislature. The dissent reasoned that the "essence of the duty imposed by the majority is to require the

undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." "The discretion granted the trial court by section 352 is not absolute [citations] and must be exercised reasonably in accord with the facts before the court." (*Brainard* v. *Cotner* (1976) 59 Cal.App.3d 790, 796 [130 Cal.Rptr. 915].)

disclosures which existing law has declined to require." Furthermore, the dissent disagreed with the majority's imposition of liability on the third cause of action for wrongful death based on the intentional infliction of emotional distress on Nally, pointing out that the majority "ignored the record" and created an unconstitutional distinction between different ecclesiastic purposes.

Our review of the record reveals the trial court correctly granted a nonsuit as to plaintiffs' causes of action. Neither the evidence adduced at trial nor well-established principles of tort law support the Court of Appeal's reversal of nonsuit in this case. As we explain below, we need not address the constitutional issues posed by defendants.

## IV. DISCUSSION

### A. *Nonsuit*

A defendant is entitled to a nonsuit if the trial court determines that, as a matter of law, the evidence presented by plaintiff is insufficient to permit a jury to find in his favor. (*Campbell* v. *General Motors Corp.* (1982) 32 Cal.3d 112, 117-118 [184 Cal.Rptr. 891, 649 P.2d 224, 35 A.L.R.4th 1036].) "In determining whether plaintiff's evidence is sufficient, the court may not weigh the evidence or consider the credibility of witnesses. Instead, the evidence most favorable to plaintiff must be accepted as true and conflicting evidence must be disregarded. The court must give 'to the plaintiff['s] evidence all the value to which it is legally entitled, . . . indulging every legitimate inference which may be drawn from the evidence in plaintiff['s] favor.'" (*Id.*, at p. 118.) A mere "scintilla of evidence" does not create a conflict for the jury's resolution; "there must be *substantial evidence* to create the necessary conflict." (7 Witkin, Cal. Procedure (3d ed. 1985) Trial, § 410, p. 413, italics in original.)

In reviewing a grant of nonsuit, we are "guided by the same rule requiring evaluation of the evidence in the light most favorable to the plaintiff." (*Carson* v. *Facilities Development Co.* (1984) 36 Cal.3d 830, 839 [206 Cal.Rptr. 136, 686 P.2d 656].) We will not sustain the judgment "'unless interpreting the evidence most favorably to plaintiff's case and most strongly against the defendant and resolving all presumptions, inferences and doubts in favor of the plaintiff a judgment for the defendant is required as a matter of law.'" (*Ibid.*, quoting *Mason* v. *Peaslee* (1959) 173 Cal.App.2d 587, 588 [343 P.2d 805].) Keeping in mind the foregoing standard of review, we now turn to the merits.

## B. *Cause of Action for Negligent Failure to Prevent Suicide*

As stated above, the Court of Appeal characterized the first two counts of plaintiffs' complaint (for clergyman malpractice and negligence) as together stating a cause of action for the "negligent failure [by a nontherapist counselor] to prevent suicide." Conceding that "research [did] not uncover any court decision which has ruled one way or the other specifically on the existence or scope of a *nontherapist counselor's* duty toward suicidal counselees," and that it was venturing "along a largely uncharted path," the Court of Appeal imposed a new and broad duty of care on such counselors without any discussion of causation under the present facts.

As Justice Cole pointed out in his dissent, however, the obligation imposed by the majority is loosely phrased. Indeed, the Court of Appeal used widely varying terminology in describing the duty of care arising under the first two causes of action. At different points in its opinion, the Court of Appeal referred to the duty imposed on nontherapist counselors as a duty "to refer counselees to those who possess . . . powers to prevent an imminent suicide"; "to refer . . . to those individuals or institutions authorized and specially suited to prevent suicide"; "to take steps to place [a suicidal person] in the hands of those to whom society has given the authority and who by education and experience are in the best position to prevent the suicidal individual from succeeding in killing himself"; "informing those in a position to prevent the counselee's suicide about the factors suggesting the counselee's imminent plans to kill himself"; "to insure their counselees also are under the care of psychotherapists, psychiatric facilities, or others authorized and equipped to forestall imminent suicide"; and finally, "to take appropriate measures to prevent [a] suicide." As we explain below, we reject the Court of Appeal's imposition of a broad "duty to refer" on defendants and nontherapist counselors in general.

### Legal Requirements for Imposing a Duty of Care

#### a) *Creation of a Duty of Care*

 "A tort, whether intentional or negligent, involves a violation of a *legal duty,* imposed by statute, contract or otherwise, owed by the defendant to the person injured. Without such a duty, any injury is 'damnum absque injuria'—injury without wrong. [Citations.]" (5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 6, p. 61, italics in original.) Thus, in order to prove facts sufficient to support a finding of negligence, a plaintiff must show that defendant had a duty to use due care, that he breached that duty, and that the breach was the proximate or legal cause of the resulting injury.

*(United States Liab. Ins. Co.* v. *Haidinger-Hayes, Inc.* (1970) 1 Cal.3d 586, 594 [83 Cal.Rptr. 418, 463 P.2d 770].)

 Under traditional tort law principles, one is ordinarily not liable for the actions of another and is under no duty to protect another from harm, in the absence of a special relationship of custody or control. (*Davidson* v. *City of Westminister* (1982) 32 Cal.3d 197, 203 [185 Cal.Rptr. 252, 649 P.2d 894]; *Tarasoff* v. *Regents of University of California* (1976) 17 Cal.3d 425, 435 [131 Cal.Rptr. 14, 551 P.2d 334, 83 A.L.R.3d 1166].) Moreover, in determining the existence of a duty of care in a given case, we must consider several factors, including the "foreseeability of harm to [the injured party], the degree of certainty that [he] suffered injury, the closeness of the connection between [defendants'] conduct and the injury suffered, the moral blame attached to [defendants], the policy of preventing future harm, the extent of the burden to the defendant[s] and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved." (*Rowland* v. *Christian* (1968) 69 Cal.2d 108, 113 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496].) Thus, because liability for negligence turns on whether a duty of care is owed, our first task is to determine whether a duty exists in the present case.

b) *Special Relationship*

 Although we have not previously addressed the issue presently before us, we have imposed a duty to prevent a foreseeable suicide only when a special relationship existed between the suicidal individual and the defendant or its agents. For example, two cases imposed such a duty in wrongful death actions after plaintiffs proved that the deceased committed suicide in a hospital or other in-patient facility that had accepted the responsibility to care for and attend to the needs of the suicidal patient. (See *Meier* v. *Ross General Hospital* (1968) 69 Cal.2d 420 [71 Cal.Rptr. 903, 445 P.2d 519]; *Vistica* v. *Presbyterian Hospital* (1967) 67 Cal.2d 465 [62 Cal.Rptr. 577, 432 P.2d 193].) In *Meier,* a cause of action for negligence was held to exist against both the treating psychiatrist and the hospital, and in *Vistica,* liability was imposed on the hospital alone, the only named defendant in the case.

The Court of Appeal here would extend the previously carefully limited precedent, relying initially for the creation of a duty of care (on defendants and other nontherapist counselors) in the foregoing *Meier* and *Vistica* cases. Indeed, the Court of Appeal specifically stated that "Logic and policy both dictate the duty announced in those cases applies to non-therapist counselors as well." We disagree. As defendants and amici curiae point out, *Meier*

and *Vistica* are readily distinguishable from the facts of the present case and, as we explain, severely circumscribe the duty they create.

Both *Meier* and *Vistica* address the issue of a special relationship, giving rise to a duty to take precautions to prevent suicide, in the limited context of hospital-patient relationships where the suicidal person died while under the care and custody of hospital physicians who were aware of the patient's unstable mental condition. In both cases, the patient committed suicide while confined in a hospital psychiatric ward. Liability was imposed because defendants failed to take precautions to prevent the patient's suicide even though the medical staff in charge of the patient's care knew that the patient was likely to attempt to take his own life.

Neither case suggested extending the duty of care to personal or religious counseling relationships in which one person provided nonprofessional guidance to another seeking advice and the counselor had no control over the environment of the individual being counseled. In sharp contrast, Nally was not involved in a supervised medical relationship with defendants, and he committed suicide well over two weeks after he was released from the hospital against the advice of his attending psychiatrist and physician.

Plaintiffs and the Court of Appeal also rely on *Bellah* v. *Greenson* (1978) 81 Cal.App.3d 614, 620-623 [146 Cal.Rptr. 535, 17 A.L.R.4th 1118], as supporting the existence of a special relationship sufficient to impose a duty of care on nontherapist counselors to refer a counselee to a licensed mental health professional once the potential suicide becomes foreseeable. As we explain, the Court of Appeal would unduly extend the *Bellah* holding.

In *Bellah,* two years after their daughter's suicide, plaintiffs brought a wrongful death action against a psychiatrist who had been treating the daughter on an out-patient basis. Plaintiffs alleged the existence of a psychiatrist-patient relationship between defendant and their daughter, knowledge on the part of the defendant that their daughter was likely to attempt suicide, and a failure by defendant to take appropriate preventative measures "consonant with good medical practice in the community." (*Bellah, supra*, 81 Cal.App.3d at p. 620.) The Court of Appeal affirmed the trial court's order sustaining defendant's demurrer after concluding that the action was barred by the one-year statute of limitations contained in Code of Civil Procedure section 340.5.

In dictum, the *Bellah* court recognized that although plaintiffs' action was time barred, they had stated a traditional medical malpractice cause of action for the breach of a psychiatrist's duty of care to his patient. *Bellah* stated that this duty may be imposed on the treating psychiatrist even

though his patient committed suicide outside the confines of a hospital. (81 Cal.App.3d at p. 620.) It is important to recognize, however, that rather than creating a broad duty to refer, the *Bellah* court simply recognized that plaintiffs had stated a "cause of action for the breach by a medical practitioner of the duty of care owed to his patient [which] has long existed in this state." In so doing, *Bellah* distinguished *Meier, supra,* 69 Cal.2d 420, and *Vistica, supra,* 67 Cal.2d 465. The court stated: "Obviously, the duty imposed upon those responsible for the care of a patient in an institutional setting differs from that which may be involved in the case of a psychiatrist treating patients on an out-patient basis." (*Bellah, supra,* at p. 620.) Indeed, *Bellah* concluded that licensed medical professionals simply have no duty to disclose to third persons "vague or even specific manifestations of suicidal tendencies on the part of the patient who is being treated in an out-patient setting . . . ." (*Bellah, supra,* at p. 621.)

In a related context, the *Bellah* plaintiffs claimed that *Tarasoff, supra,* 17 Cal.3d 425, "created a duty on the part of the defendant . . . to breach the confidence of a doctor-patient relationship by revealing to them disclosures made by their daughter about conditions which might cause her to commit suicide." (*Bellah, supra,* 81 Cal.App.3d at p. 620.) The *Bellah* court, however, refused to accept plaintiffs' argument that *Tarasoff* created a new duty on the part of the defendant "to warn others of the likelihood of any and all harm which might be inflicted by a patient. . . ." (*Id.,* at p. 621.)

Similarly, *Bellah* recognized that creating a duty on the part of a psychiatrist to breach the confidence of a doctor-patient relationship by revealing disclosures made about the suicidal intent of his patient would unduly extend the *Tarasoff* holding, and "could well inhibit psychiatric treatment." (*Bellah, supra,* 81 Cal.App.3d at p. 621.) *Bellah* reasoned that in *Tarasoff,* we held only that "where a therapist knows that his patient is likely to injure another and where the identity of the likely victim is known or readily discoverable by the therapist, he must use reasonable care to prevent his patient from causing the intended injury. Such care includes, at the least, informing the proper authorities and warning the likely victim. However, [*Tarasoff*] did not hold that such disclosure was required where the danger presented was that of self-inflicted harm or suicide. . . . Instead, [*Tarasoff*] recognized the importance of the confidential relationship which ordinarily obtains between a therapist and his patient, holding that '. . . the therapist's obligations to his patient require that he *not disclose a confidence unless such disclosure is necessary to avert danger to others.* . . . (*Tarasoff, supra,* p. 441, italics added.)' " (*Bellah, supra,* 81 Cal.App.3d at pp. 620-621.)

Rather than create a duty to prevent suicide, *Bellah* (and *Meier* and *Vistica*) recognized that a cause of action may exist for *professional malprac-*

*tice* when a psychiatrist's (or hospital's) treatment of a suicidal patient falls below the standard of care for the profession, thus giving rise to a traditional malpractice action.[6] *Bellah* held that courts should not extend *Tarasoff* to require psychiatrists to disclose the confidences of their patients when harm to a third party is not contemplated. (*Bellah, supra*, 81 Cal.App.3d at pp. 620-621.) Thus, contrary to the Court of Appeal's interpretation of *Bellah, Vistica,* and *Meier,* none of these cases supports the finding of a special relationship between Nally and defendants, or the imposition of a duty to refer a suicidal person to a professional therapist as urged in the present case. Indeed, on their limited facts, *Bellah, Vistica* and *Meier* weigh against creating such a duty. With the foregoing in mind, we now turn to other considerations articulated in *Rowland* v. *Christian, supra,* 69 Cal.2d 108, 112-113, and explain further why we should not impose a duty to prevent suicide on defendants and other nontherapist counselors.

c) *The Connection Between Defendants' Conduct and Nally's Suicide and the Foreseeability of Harm*

Other factors to consider in determining whether to impose a duty of care on defendants include the closeness of the causal connection between defendants' conduct and the injury suffered, and the foreseeability of the particular harm to the injured party. (*Rowland, supra,* 69 Cal.2d at p. 113; see *Davidson, supra,* 32 Cal.3d 197, 209.)

Plaintiffs argue that Nally's statement to Pastors Rea and MacArthur (while he was recovering from his suicide attempt at the hospital), "that he was sorry he wasn't successful and that he would attempt suicide after his release from the hospital," were "hidden dangers" that would have affected his prognosis and treatment. Accordingly, plaintiffs reason that Rea and MacArthur should have warned the hospital staff and plaintiffs that Nally was still contemplating suicide after his initial attempt. We disagree.

The closeness of connection between defendants conduct and Nally's suicide was tenuous at best.[7] As defendants observe, Nally was examined by

---

[6] Contrary to Justice Kaufman's suggestion (see conc. opn. by Kaufman, J., at p. 310), *Bellah, supra,* 81 Cal.App.3d 614, 620, never imposed "an affirmative duty on a psychiatrist to see that his patient does no harm to himself." If such were the case, psychiatrists could be held responsible whenever one of their patients made the unfortunate decision to take his own life. We reject such a broad interpretation of the *Bellah* dictum, and emphasize that because the court affirmed the trial court's order sustaining the psychiatrist's demurrer without leave to amend and dismissed the action, it never decided the duty issue.

[7] Generally, there is a real question about the closeness of the causal connection between a nontherapist counselor's failure to refer to professional help and the suicide of a particular suicidal person. By their very definition, nontherapist counselors are not professional medical

five physicians and a psychiatrist during the weeks following his suicide attempt. Defendants correctly assert that they "arranged or encouraged many of these visits and encouraged Nally to continue to cooperate with all doctors." (See *United States Liab. Ins. Co., supra,* 1 Cal.3d 586, 594.) In addition, as stated above, following Nally's overdose attempt Dr. Evelyn warned plaintiffs that Nally remained suicidal and that they should encourage him to see a psychiatrist on his release from the hospital. Plaintiffs also rejected both Dr. Hall's and Dr. Parker's suggestion that Nally be institutionalized because, according to plaintiffs, their son was "not crazy."

Nevertheless, we are urged that mere knowledge on the part of the defendants that Nally may have been suicidal at various stages in his life should give rise to a duty to refer. Imposition of a duty to refer Nally necessarily would imply a general duty on all nontherapists to refer all potentially suicidal persons to licensed medical practitioners.

One can argue that it is foreseeable that if a nontherapist counselor fails to refer a potentially suicidal individual to professional, licensed therapeutic care, the individual may commit suicide. While under some circumstances counselors may conclude that referring a client to a psychiatrist is prudent and necessary, our past decisions teach that it is inappropriate to impose a duty to refer—which may stifle all gratuitous or religious counseling—based on foreseeability alone. Mere foreseeability of the harm or knowledge of the danger, is insufficient to create a legally cognizable special relationship giving rise to a legal duty to prevent harm. (See *Davidson, supra,* 32 Cal.3d 197, 209.)

d) *Public Policy Considerations*

Imposing a duty on defendants or other nontherapist counselors to, in the Court of Appeal's words, "insure their counselees [are also] under the care of psychotherapists, psychiatric facilities, or others authorized and equipped to forestall imminent suicide," could have a deleterious effect on counseling in general. (See *Bellah, supra,* 81 Cal.App.3d at p. 621.) Although both plaintiffs and the present Court of Appeal, in dictum, exempt services such as "teen hotlines" which offer only "band aid counseling," from a newly formulated standard of care that would impose a "duty to refer," the indeterminate nature of liability the Court of Appeal imposes on nontherapist counselors could deter those most in need of help from seeking treatment out of fear that their private disclosures could subject them to involuntary commitment to psychiatric facilities.

experts on suicide. Their activities are undertaken pursuant to doctrines explicitly left unregulated by the state. (See *post* at p. 298.)

As defendants, amici curiae, and the Court of Appeal dissenter observe, neither the Legislature nor the courts have ever imposed a legal obligation on persons to take affirmative steps to prevent the suicide of one who is not under the care of a physician in a hospital. (See *Katona* v. *County of Los Angeles* (1985) 172 Cal.App.3d 53, 59 [218 Cal.Rptr. 19]; see also, *Searcy* v. *Hemet Unified School Dist.* (1986) 177 Cal.App.3d 792, 804 [223 Cal.Rptr. 206] [school district owes duty to safeguard student on school premises during school hours, but owes no such duty once the student has departed for home].) Indeed, for all practical purposes, a doctor to whom a nontherapist counselor refers a suicidal person may refuse to take the patient. Furthermore, under the Lanterman-Petris-Short Act (Welf. & Inst. Code, §§ 5200, 5201), "[a]ny individual may" but is not required to institute involuntary commitment proceedings.

We also note that the Legislature has exempted the clergy from the licensing requirements applicable to marriage, family, child and domestic counselors (Bus. & Prof. Code, § 4980 et seq.) and from the operation of statutes regulating psychologists (*id.*, § 2908 et seq.). In so doing, the Legislature has recognized that access to the clergy for counseling should be free from state imposed counseling standards, and that "the secular state is not equipped to ascertain the competence of counseling when performed by those affiliated with religious organizations." (Ericsson, *Clergyman Malpractice: Ramifications of a New Theory* (1981) 16 Val.U.L.Rev. 163, 176.)

Furthermore, extending liability to voluntary, noncommercial and noncustodial relationships is contrary to the trend in the Legislature to encourage private assistance efforts. This public policy goal is expressed in the acts of the Legislature abrogating the "Good Samaritan" rule. Statutes barring the imposition of ordinary negligence liability on one who aids another now embrace numerous scenarios. (See, e.g., Gov. Code, § 50086 [exempting from liability first aid volunteers summoned by authorities to assist in search or rescue operations]; Health & Saf. Code, §§ 1799.100, 1799.102 [exempting from liability nonprofessional persons giving cardiopulmonary resuscitation].)

On occasion, when the courts have recognized a new duty of care sufficient to impose liability for the breach thereof, they have noted that the "wrongs and injuries involved were both comprehensible and assessable within the existing judicial framework." (*Peter W.* v. *San Francisco Unified Sch. Dist.* (1976) 60 Cal.App.3d 814, 824 [131 Cal.Rptr. 854] [refusing to impose liability on school district for graduated plaintiff's inability to read and write]; see also, *Dillon* v. *Legg* (1968) 68 Cal.2d 728, 742-747 [69 Cal.Rptr. 72, 441 P.2d 912, 29 A.L.R.3d 1316].)

Even assuming that workable standards of care could be established in the present case, an additional difficulty arises in attempting to identify with precision those to whom the duty should apply. Because of the differing theological views espoused by the myriad of religions in our state and practiced by church members, it would certainly be impractical, and quite possibly unconstitutional, to impose a duty of care on pastoral counselors. Such a duty would necessarily be intertwined with the religious philosophy of the particular denomination or ecclesiastical teachings of the religious entity. (See Esbeck, *Tort Claims Against Churches and Ecclesiastical Officers; The First Amendment Considerations* (1986) 89 W.Va.L.Rev. 1, 82-84; Comment, *Religious Torts: Applying the Consent Doctrine as Definitional Balancing* (1986) 19 U.C. Davis L.Rev. 949, 963-964, fn. 69; see also, *Lemon* v. *Kurtzman* (1971) 403 U.S. 602 [29 L.Ed.2d 745, 91 S.Ct. 2105].) We have previously refused to impose a duty when to do so would involve complex policy decisions, and we are unpersuaded by plaintiffs that we should depart from this policy in the present case. (See *Thomson* v. *County of Alameda* (1980) 27 Cal.3d 741, 754-755 [167 Cal.Rptr. 70, 614 P.2d 728, 12 A.L.R.4th 701]; *Bill* v. *Superior Court* (1982) 137 Cal.App.3d 1002, 1012-1013[187 Cal.Rptr. 625].)

e) *Availability of Insurance*

As several commentators observe, although lawsuits stemming from spiritual counseling are few, a new type of "clergyman malpractice" insurance has been offered to religious organizations to protect against potential liability for spiritual counseling that causes injury. (See, e.g., Note, *Intentional Infliction of Emotional Distress by Spiritual Counselors: Can Outrageous Conduct Be "Free Exercise"?* (1986) 84 Mich.L.Rev. 1296, 1300, fn. 12.) Apparently, such insurance provides coverage to religious congregations and their pastors for damages caused by the counseling activities of the pastors while acting within the scope of their duties. (*Ibid.*) The value of such insurance, however, is unknown and difficult to determine because few cases have been filed against the clergy.

f) *Conclusion*

For the foregoing reasons, we conclude that plaintiffs have not met the threshold requirements for imposing on defendants a duty to prevent suicide. (*Rowland, supra,* 69 Cal.2d 108, 113.) Plaintiffs failed to persuade us that the duty to prevent suicide (heretofore imposed only on psychiatrists and hospitals while caring for a suicidal patient) or the general professional duty of care (heretofore imposed only on psychiatrists when treating a mentally disturbed patient) should be extended to a nontherapist counselor

who offers counseling to a potentially suicidal person on secular or spiritual matters.

In the present case, the Court of Appeal erroneously created a broad duty to refer, and to hold defendants potentially accountable for Nally's death based on their counseling activities would place blame unreasonably and contravene existing public policy.[8] Accordingly, we conclude the trial court correctly granted defendants' nonsuit motion as to the "clergyman malpractice" and negligence causes of action.

## C. *Cause of Action for Wrongful Death Based on Intentional Infliction of Emotional Distress*

### a) *Elements of the Tort*

■ The elements of a cause of action for intentional infliction of emotional distress are (i) outrageous conduct by defendant, (ii) an intention by defendant to cause, or reckless disregard of the probability of causing, emotional distress, (iii) severe emotional distress, and (iv) an actual and proximate causal link between the tortious conduct and the emotional distress. (*Cole* v. *Fair Oaks Fire Protection Dist.* (1987) 43 Cal.3d 148, 155, fn. 7 [233 Cal.Rptr. 308, 729 P.2d 743].) The "[c]onduct to be outrageous must be so extreme as to exceed all bounds of that usually tolerated in a civilized community." (*Davidson, supra,* 32 Cal.3d at p. 209, quoting from *Cervantez* v. *J.C. Penney Co.* (1979) 24 Cal.3d 579, 593 [156 Cal.Rptr. 198, 595 P.2d 975].) As stated in part III hereof, the Court of Appeal limited its discussion of the third cause of action for intentional infliction of emotional distress, to the question of whether the trial court erred in (i) excluding the tape pursuant to Evidence Code section 352, and (ii) granting the nonsuit motion as to the intentional infliction of emotional distress count.

We have found only one California case in which an appellate court affirmed a trial court decision overruling a demurrer and allowing a cause of action for wrongful death based on defendant's outrageous conduct in causing a suicide. In *Tate* v. *Canonica* (1960) 180 Cal.App.2d 898, 909 [5 Cal.Rptr. 28], the court allowed a widow to state a cause of action for wrongful death based on intentional infliction of emotional distress after she alleged that defendant intentionally made threats and accusations against her husband and such conduct was a *substantial factor* in bringing about the husband's suicide. The *Tate* court rejected as inapplicable to intentional torts, the defenses of supervening cause and contributory negligence. (*Id.,* at

[8]Our opinion does not foreclose imposing liability on nontherapist counselors, who hold themselves out as professionals, for injuries related to their counseling activities.

p. 908.) ■ Thus, under *Tate,* a plaintiff may resist a demurrer to a wrongful death action for intentional conduct leading to suicide if he can allege facts sufficient to show that defendant's conduct was outrageous *and* a substantial factor in the decedent's suicide. (*Tate, supra*, 180 Cal.App.2d 898, 909.) With the foregoing in mind, we now turn to the present case in order to determine whether the trial court properly excluded the tape of Pastor Thomson's 1980 lecture under Evidence Code section 352, or whether the evidence was relevant to proving plaintiffs' third cause of action consistently with the *Tate* and *Davidson, supra*, 32 Cal.3d 197, standards.

### b) *Procedural Background*

The Court of Appeal did not discuss defendants' First Amendment defenses to the admissibility of the tape recording, because it believed it was bound, under the law of the case doctrine (discussed below), by the holding in *Nally I* that the First Amendment did not immunize defendants from liability. The court, however, did not believe it was prevented from examining the "sufficiency of the evidence introduced at trial to support the third count."

The court found, as did the Court of Appeal in *Nally I,* that the tape recording was essential to establishing plaintiffs' cause of action for wrongful death based on intentional infliction of emotional distress, and that its exclusion was therefore erroneous. The court stated that in "[c]onstruing the evidence [including the tape recording] most favorably to [plaintiffs] we conclude a reasonable juror could have found the counselors acted recklessly in a way which encouraged this suicide."

Plaintiffs, on the other hand, do not address the merits of the trial court's exclusion of the tape but instead argue that the trial and appellate courts are bound by the law-of-the-case doctrine insofar as it precludes reconsideration of defendants' asserted constitutional defenses and the objections concerning the viability of plaintiffs' third cause of action for intentional infliction of emotional distress. Plaintiffs assert that we are bound by the appellate court ruling in *Nally I* that the facts of this case satisfy the requirements of the substantive tort of intentional infliction of emotional distress.

### c) *Law-of-the-case Doctrine*

■ Under this doctrine, "the decision of an appellate court, stating a rule of law necessary to the decision of the case, conclusively establishes that rule and makes it determinative of the rights of the same parties in any subsequent retrial or appeal in the same case." (9 Witkin, Cal. Procedure

(3d ed. 1985) Appeal, § 737, pp. 705-707.) The rule is not invoked where the sufficiency of the evidence necessary to sustain the judgment depends on the probative value or effect of the evidence itself, and the evidence in the second trial is changed. (9 Witkin, *supra,* § 750, at p. 718.) Similarly, the doctrine does not apply to points of law that might have been, but were not determined on the prior appeal. (9 Witkin, *supra,* § 752 at pp. 719-720; *Tally* v. *Ganahl* (1907) 151 Cal. 418, 421 [90 P. 1049].)

 Recently, an additional reason for declining to apply the doctrine was announced in *Searle* v. *Allstate Life Ins. Co.* (1985) 38 Cal.3d 425 [212 Cal.Rptr. 466, 696 P.2d 1308], in which we held: "The primary purpose served by the law-of-the-case rule is one of judicial economy. Finality is attributed to an initial appellate ruling so as to avoid the further reversal and proceedings on remand that would result if the initial ruling were not adhered to in a later appellate proceeding . . . . That reason for the rule is inoperative when the court hearing the subsequent appeal determines that there should be a reversal on a ground that was not considered on the prior appeal. The fact that reversal is necessary in any event frees us from the compulsion that the rule of law of the case might otherwise impose on us to follow a ruling in the prior appeal that we now perceive to be manifestly erroneous." (38 Cal.3d at p. 435.)

We perceive no obstacle under the law-of-the-case doctrine to reviewing the evidentiary question regarding the tape recording's admissibility. Contrary to plaintiffs' assertion that we are bound by a theoretical imposition of liability on defendants based on the findings in *Nally I,* the Court of Appeal there found only that plaintiffs had raised a triable issue of fact sufficient to defeat a summary judgment motion, and therefore did not determine liability as plaintiffs seem to imply.

 As we explain below, however, we disagree with the Court of Appeal's conclusion that the trial court improperly excluded the evidence under Evidence Code section 352. Accordingly, it is unnecessary to reach the broader constitutional issues raised by the parties, or the validity of the Court of Appeal's holding that the constitutional defense was barred by the law-of-the-case doctrine.

d) *Analysis of the Evidentiary Ruling*

In 1981, 18 months after Nally's suicide, Pastor Thomson taught a series of classes of biblical counseling. The class sessions included question and answer periods that were tape-recorded. During one session, a student questioned Thompson on whether a person who committed suicide could be "saved." Thompson replied, in a manner consistent with Reformation

Protestant theology views regarding sin, grace and faith, that a person neither acquires salvation by his own works nor forfeits salvation by the commission of subsequent sins. Plaintiffs sought to introduce the tape recording at trial on the basis that it provided inferential proof of Thomson's advice to Nally during the three counseling sessions in 1979.

The court held extensive hearings outside the presence of the jury on the admissibility of the recording to determine whether its content was relevant. During the in camera sessions, the court pointed out that even if the recording were admitted, there was no evidence Thomson spoke similar words to Nally during their counseling sessions or that such words could have contributed in any way to, or proximately caused, Nally's death. The court also observed that the best way to establish what Thomson told Nally was through direct examination. Eventually, the court ruled it would not admit the recording, "on the basis that its relevancy is such that it would necessitate the undue consumption of time, would create substantial danger of undue influence to the jury and could confuse the issues and be misleading to the jury." (See Evid. Code, § 352.)

In determining whether the trial court properly exercised discretion in excluding the tape, we consider the relationship between the evidence and the relevant inferences to be drawn from it. (See *Kessler* v. *Gray* (1978) 77 Cal.App.3d 284, 291 [143 Cal.Rptr. 496].) The Court of Appeal stated that the tape recording was relevant to prove Pastor Thomson's "own personal state of mind on the question of suicide and suicide counseling and how other counselors were trained on these issues." The court asserted that "the statements on the tape [were] relevant to prove the probable content of the counseling the defendants offered [to] the plaintiffs' suicidal son. The tape recordings tend to establish the customary approach the Church's counselors used when counseling suicidal individuals." These conclusions appear to misstate the relevant evidence.

First, as the trial court found, the tape does not tend to prove that defendants in any way encouraged Nally to commit suicide or acted recklessly in disregard of Nally's emotional state prior to his suicide. (See *People* v. *Jones* (1954) 42 Cal.2d 219, 222 [266 P.2d 38].) Although there is some indication in the record that Nally may have attended some of defendants' Bible classes between 1974 and 1979, there is no evidence that Thomson was ever asked about salvation and suicide during a lecture prior to 1980 or that he would have given a similar response at that time if he had been so asked. Moreover, as Thomson himself testified, his responses to questions in the classroom setting would by their very nature differ from the way he handled an individual counseling session because he would have considered

the emotional state of the individual and his particular counseling needs during the counseling session.

In addition, the evidence was simply too temporally remote to establish any causal connection with Nally's suicide. As Justice Cole's dissent in the Court of Appeal observes, "what was said in an extemporaneous answer, which did not precisely reflect the thoughts of Pastor Thomson, given almost two years after the incident at issue is at best marginally relevant to prove what was said at the time in question. The trial judge made a carefully considered decision after considerable deliberation. Clearly, there was a basis for the trial court's ruling that admission of the tape created substantial danger of misleading the jury and prejudicing the defendants." Based on the foregoing, we disagree with the Court of Appeal's conclusion that the response given by Pastor Thomson to an inquiry by a seminary student almost two years after Nally's suicide could assist in establishing what Pastor Thomson told Nally during the individual counseling sessions.

Finally, "California trial judges have considerable discretion under Evidence Code section 352 to exclude evidence if its probative value is substantially outweighed by its prejudicial effect." (*Michail* v. *Fluor Mining & Metals, Inc.* (1986) 180 Cal.App.3d 284, 286 [225 Cal.Rptr. 403].) Because the record shows that the trial court carefully and properly weighed the prejudicial effect of the evidence against its probative value, the Court of Appeal erred in finding that a substantial abuse of discretion occurred in excluding the evidence.

## V. CONCLUSION

We conclude the trial court correctly granted a nonsuit on all causes of action. The suicide of a young man in the prime of his life is a profound tragedy. After considering plaintiffs' arguments and evidence, however, we hold that defendants had no duty to Nally on which to base liability for his unfortunate death.

The judgment of the Court of Appeal is reversed and the Court of Appeal is directed to enter judgment affirming the judgment of nonsuit and dismissing the action.

Mosk, J., Panelli, J., Arguelles, J., and Eagleson, J., concurred.

KAUFMAN, J.—I concur in the judgment that nonsuit was properly granted, but disagree with the majority's holding that defendants owed no duty of care to the plaintiffs.

The majority appears to reject the proposition that defendants in this matter, or "nontherapist counselors in general," have a duty to advise potentially suicidal counselees to seek competent medical care. (Maj. opn. at p. 292.) Yet the majority does not purport to "foreclose imposing liability on nontherapist counselors, who hold themselves out as professionals, for injuries related to their counseling activities." (Maj. opn. at p. 300, fn. 8.)

In view of the majority's suggestion that a nontherapist counselor who holds himself out as competent to treat a suicidal person owes a duty of care to that person, I am baffled as to the basis or the *necessity* of the majority's broad conclusion that "nontherapist counselors in general" do *not* owe such a duty. The evidence in the record, viewed—as the law requires—in *plaintiffs'* favor, demonstrates that defendants (1) expressly held themselves out as fully competent to deal with the most severe psychological disorders, including major depression with suicidal symptoms, (2) developed a close counseling relationship with Kenneth Nally for that very purpose, and (3) realized that Nally's suicide was at least a possibility. Thus, the evidence was more than sufficient, in my view, to trigger a minimal duty of care to Nally. What was fatally *absent* from plaintiffs' case was not evidence of duty, but proof that defendants breached that duty, and that such breach constituted a proximate cause of Nally's suicide. Therefore, while I concur in the decision to reverse the judgment of the Court of Appeal and to reinstate the judgment of nonsuit and dismissal of the action, I strongly disagree with the conclusion that defendants owed no duty of care in this matter.

## FACTS

While the majority faithfully chronicles the tragic sequence of events which led to Nally's suicide, it quite inexplicably overlooks the substantial evidence adduced by plaintiffs relating to the nature and extent of the pastoral counseling offered by defendants. The picture which emerges from the record is decidedly *not* that of a small band of simple pastors who offered occasional counseling on minor matters to the faithful few. The Grace Community Church (Church), at the time of the events in question, employed about 50 pastoral counselors to serve a congregation of over 10,000 persons. Pastoral counseling, as described in the Church's 1979 annual report, constituted "a very important part of the ministry at Grace Church." Church counselors offered their services not only to congregants, but to large numbers of nonmembers as well. In 1979, the annual report noted, about 50 percent of those seeking counseling came from outside the Church. Furthermore, while much of the counseling to members was apparently of an ad hoc or "drop-in" nature, more formal counseling was offered as well, with regularly scheduled counseling "sessions" much like

those between a therapist and a patient; indeed, the Church employed a secretary whose responsibilities included the making and scheduling of such counseling appointments. Moreover, in addition to individual counseling, a number of Church pastors taught classes, published books and sold tape recordings on the subject of biblical counseling.[1]

In addition to the foregoing, plaintiffs adduced substantial evidence relating to the stated ability of the Church's pastoral counselors to deal with serious emotional and psychological disorders. Several of the counselors testified that they considered themselves fully competent to treat a whole range of mental illnesses, including depression and schizophrenia—indeed, as Pastor Thomson testified, "any type of emotional problem." Several of the counselors who testified, including Pastors Rea, Barshaw and Thomson, claimed to possess not only competence, but broad experience in the counseling of persons with recurrent suicidal or even homicidal tendencies.

This asserted capacity to handle severe psychological disorders was also reflected in a Church publication entitled "Guide For Biblical Counselors" (Guide). Pastor Thomson was the author of the Guide, which served as a basic text for aspiring biblical counselors and was required reading in Thomson's class on biblical counseling. According to Pastor Thomson, absent a gross physiological cause such as a brain tumor, "every emotional problem" was within the competence of the pastoral counselor to handle. Among the symptoms or disorders the Guide listed as falling within the pastoral counselor's domain were "drug abuse, alcoholism, phobias, deep depression, suicide, mania, nervous breakdown, manic-depressive [disorder] and schizophrenia." The Guide devoted separate sections to a number of these disorders, including suicide, with hypothetical questions and answers interspersed throughout the text. One such exchange read as follows:

---

[1] Contrast this picture of the Church's extensive involvement in pastoral counseling (based on evidence in the record), with that portrayed in the majority opinion. The majority writes: "According to the trial testimony of defendant Senior Pastor MacArthur, 'Grace Community Church does not have a professional or clinical counseling ministry. We don't run a counseling center as such. We aren't paid for that, and we don't solicit that . . . .'" (Maj. opn. at p. 284.) While not a major point in itself, such selective citation of the record undoubtedly colors one's overall assessment of the case, and to that extent is objectionable. As the majority itself notes, on review of a nonsuit "the evidence most favorable to *plaintiff*[*s*] must be accepted as true and conflicting evidence must be disregarded. The court must give 'to the *plaintiff*[*s*'] *evidence* all the value to which it is legally entitled, . . . indulging every legitimate inference which may be drawn from the evidence in *plaintiff*[*s*'] favor.'" (*Campbell* v. *General Motors Corp.* (1982) 32 Cal.3d 112, 117-118 [184 Cal.Rptr. 891, 649 P.2d 224, 35 A.L.R.4th 1036], italics added.) The majority has reversed this fundamental principle of appellate review, stating the evidence, resolving all factual conflicts, and drawing all reasonable inferences in favor of *defendants*. Moreover, in addition to the above example, violations of this principle occur throughout the majority opinion. (See fns. 2, 3, 4, and 5, *post*, at pp. 284-285, 289.)

"[Question]: You mean *I* could counsel with an extreme problem like a suicidal tendency or nervous breakdown or something like that? [¶] [Answer]: With the proper understanding of God's Word to diagnose and treat the problems, this could not only be done occasionally but could become the rule."[2]

Nally was well aware of defendants' self-proclaimed proficiency at treating severe depression and suicidal symptoms. Nally was a student in Pastor Thomson's course on biblical counseling, which used the Guide as a text, and affirmatively sought out formal or informal pastoral counseling from defendants during each of his several suicidal crises.

Moreover, the record leaves no doubt that defendants were aware of, and affirmatively undertook to deal with, Nally's recurrent depression and suicidal thoughts. In January 1978, Nally initiated a counseling relationship with Pastor Rea. Rea testified that he had formal counseling sessions with Nally during the first four months of 1978, as well as many informal sessions both before and after that time. During these sessions, according to Pastor Rea, Nally often appeared distraught and cried, indicating that he "couldn't cope." Rea specifically recalled Nally's statement to him in his office, "I just can't live this life." Rea, who considered himself both qualified and experienced in the handling of depressed and sucidal individuals, evaluated Nally as being "depressed."[3]

---

[2]How the majority could omit from its opinion this extensive evidence of defendants' "holding out" is quite beyond my understanding. (See fn. 1, *ante,* at p. 283.)

[3]The majority asserts that I have mischaracterized Rea's testimony, that in fact "Rea did not become aware Nally could not cope in the *physical* sense until *after* his suicide attempt." (Maj. opn. at p. 284, fn. 2, original italics.) On the contrary, the majority either ignores the full record of Rea's testimony or, contrary to fundamental principles of appellate review, draws only those inferences favorable to defendants. It must be recalled that Rea was testifying as a hostile witness under Evidence Code section 776; his responses on direct examination were both dissembling and contradictory. Time and again, Rea was impeached with his own counseling notes or prior deposition testimony. So it was with his testimony regarding Nally's expressed inability to "cope." Initially, Rea admitted that Nally had stated that from time to time he could not "cope." Rea immediately denied, however, that the "cope concept" had "come out" until after Nally's first suicide attempt. Counsel then confronted Rea with his own counseling notes, and Rea was forced to admit that just the opposite was true.

"Q: Isn't it your recollection that from January forward, Ken frequently used that term, 'I don't know how to cope.'?

"A: Frequently? I can't say that, but I wrote down to express what Ken expressed to me.

"Q: And from time to time he used that phrase?

"A: I would have to say so from that record.

"Q: From time to time he used it before you terminated the formal counseling relationship?

"A: That's true.

"Q: Thank you."

Later, Rea attempted to characterize Nally's comments as referring exclusively to the "spiritual," not the "physical" life. When confronted with his prior deposition testimony,

In 1974, when Nally first joined the Church, he developed a close friendship with Pastor Cory, who was responsible for overseeing the ministry to the collegians attending the Church. In December 1978, after Nally's breakup with his girlfriend, Cory became concerned about Nally's apparent depression and referred him to Pastors Rea or Thomson for counseling. In late February or early March of 1979, Nally did approach Pastor Thomson and told him that he was depressed about his relationship with his girlfriend and his family. Nally told Thomson that he had once before considered suicide. Thomson, who considered himself both qualified and experienced in the counseling of severe depression, felt that there was an "intimation" of suicide in Nally's statements and concluded that suicide was a "vague possibility."[4] Although Thomson testified that he took such intimations

---

however, Rea was compelled to concede that the idea of *suicide* was fairly inferable from Nally's statements and conduct during the counseling sessions:

"Q: Was there an inference of suicide?

"A: Not to my knowledge.

"Q: Look to page 70 of your depo. Read from line 7 on down.

"MR. COOKSEY: How far, counsel?

"MR. BARKER: Down through line 22.

"Q: BY MR. BARKER: Does that refresh your recollection?

"A: Yes.

"Q: Was there an inference of suicide in some of the things Ken said?

"A: Inference in the extent (*sic*) of coping and how far you stretch the word, not being able to live this life, but the life is not physical life; it's the spiritual life.

"Q: There was an *inference of suicide* in some of the things Ken said during the normal counseling sessions?

"A: *It could be construed that way.*

"Q: *And the term inference was your term; is that correct?*

"A: *Yes.*" (Italics added.)

Viewing this evidence in the light most favorable to plaintiffs, it is reasonable to conclude that Nally's statements and actions during his counseling sessions with Rea reasonably indicated the possibility of suicide. The point, it should be stressed, is not that defendants knew or should have known that Nally would commit suicide; the point, rather, is that the evidence was sufficient to raise the reasonable possibility, and the reasonable possibility was sufficient to trigger a minimal duty to advise Nally to seek competent medical care.

[4] The majority suggests that I have mischaracterized the record of Thomson's testimony. (Maj. opn. at p. 285, fn. 3.) On the contrary, the majority has simply construed the evidence most favorably to *defendants,* rather than, as the law requires, indulging all reasonable inferences in favor of plaintiffs.

In fact, Thomson testified as follows: "Q: You reached the conclusion, didn't you, at the end of your first meeting with Ken in March, that Ken might try suicide?

"A: There was that vague possibility, yes. I didn't conclude within myself that it was a serious enough likelihood where other help would be needed at this point, so I counseled him and prayed for him.

"Q: Did you think that Ken, in fact, might try suicide?

"A: It was a possibility. It was a vague possibility, yes."

Thomson further testified: "Q: And you then concluded, after your questioning session, that although there was some possibility of suicide, it wasn't likely?

"A: That's true."

Elsewhere he testified: "Q: And you concluded that he probably wasn't going to commit suicide, but it was a possibility?

"seriously," he concluded that he could continue to help Nally with his problems through counseling and prayer.

Several weeks later, after Nally had in fact attempted suicide, Nally approached Thomson on two more separate occasions. During their second informal meeting, which lasted about an hour, Nally again, according to Thomson, "intimated" suicide and again Thomson concluded that suicide was a "possibility" which he continued to take "seriously."[5] During the third meeting between Nally and Thomson, the latter remained convinced that suicide was a "possibility."[6] Although Thomson was persuaded that Nally was depressed and "intimat[ing]" suicide, he continued to believe that he could help him through biblical counseling.

After Nally was released from the hospital following his suicide attempt in March 1979, he went to stay with another Church counselor, Pastor MacArthur. During long discussions over the next week, Nally discussed his depression and thoughts of suicide, and MacArthur became convinced that suicide was a real possibility. Indeed, MacArthur became so concerned from these sessions that he advised Nally to see a psychiatrist. One week after Nally left the MacArthur residence, his fears were realized. On April 1, 1979, Nally committed suicide.

## DISCUSSION

In light of the foregoing factual background, I believe the conclusion is inescapable that defendants owed a duty of care to Nally. That duty, in my

---

"A: It was a vague possibility, yes.

"Q: You took that possibility seriously?

"A: Yes.

"Q: And in taking it seriously, you talked with him about biblical concepts and about what his inter [*sic*] strifes were that led to his depression and led to his suicidal feelings?

"A: Yes.

"Q: But you did not talk to anyone else after that meeting with Ken about the fact that Ken might be a threat to himself before the Verdugo attempt?

"A: Not that I recall."

[5] Concerning this second meeting, Thomson testified as follows: "Q: And in that second visit, the suicide was discussed again, wasn't it?

"A: Yes. There was that possibility . . . .

"Q: In trying to help him as he was down, did you indirectly make an effort to find out if he was going to try again?

"A: There was that intimation there, and that's as far as I wanted to carry it."

[6] Thomson testified as follows concerning the third meeting: "Q: Were you—at that time, you still took seriously Ken's suicidality, didn't you?

"A: Yes.

"Q: And at that time, as with the first two visits, you still felt there was a chance Ken was going to commit suicide?

"A: There was a possibility."

view, was simply to recognize the limits of their own competence to treat an individual, such as Nally, who exhibited suicidal tendencies, and once having recognized such symptoms, to advise that individual to seek competent professional medical care. The record further demonstrates, however, and the majority correctly concludes, that defendants neither breached their duty to Nally nor contributed in any legally significant respect to his suicide.[7]

It is black-letter law that one may have an affirmative duty to protect another from harm where a "special relationship" exists. (*Williams* v. *State of California* (1983) 34 Cal.3d 18, 23 [192 Cal.Rptr. 233, 664 P.2d 137]; *Weirum* v. *RKO General, Inc.* (1975) 15 Cal.3d 40, 48 [123 Cal.Rptr. 468, 539 P.2d 36]; *Clarke* v. *Hoek* (1985) 174 Cal.App.3d 208, 215-216 [219 Cal.Rptr. 845]; Rest.2d Torts, § 314; Prosser & Keeton, Torts (5th ed. 1984) § 56, p. 374.) The critical question, therefore, is whether there existed some special relationship between Nally and defendants which would give rise to an affirmative duty to act.

In the special case of determining the existence of an affirmative duty to protect another, courts have traditionally looked to relationships where "the plaintiff is typically in some respect particularly vulnerable and dependent upon the defendant who, correspondingly, holds considerable power over the plaintiff's welfare." (Prosser & Keeton, *supra,* at p. 374.)

The special relationship that arises between a patient and his doctor or psychotherapist creates an affirmative duty to see that the patient does no harm either to himself (*Bellah* v. *Greenson* (1978) 81 Cal.App.3d 614, 619 [146 Cal.Rptr. 535, 17 A.L.R.4th 1118])[8] or to others (*Tarasoff* v. *Regents of*

---

[7]Unfortunately, the majority's analysis fails to properly distinguish between duty and proximate cause. Based upon a misunderstanding of our seminal decision in *Rowland* v. *Christian* (1968) 69 Cal.2d 108 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496], the majority implies that lack of causation precludes the imposition of a duty. This is a misreading of *Rowland*. That decision merely held that the "closeness of the connection between the defendant's conduct and the injury suffered" was one of a number of factors which *might* justify a *departure* from the general principle that " '[a]ll persons are required to use ordinary care to prevent others being injured as a result of their conduct.' " (*Id*. at pp. 112-113.)

[8]The majority suggests that I have mischaracterized the court's holding in *Bellah* v. *Greenson, supra,* 81 Cal.App.3d 614. Not so. The *Bellah* court stated the issues before it as follows: "[I]n the present case, we must determine whether plaintiffs have alleged facts sufficient to give rise to a duty on the part of defendant *to take steps to prevent [decedent] from committing suicide* or to advise [decedent's parents] about the existence of conditions which might cause [decedent] to take her own life, so that they could take such steps." (*Id*. at p. 619, italics added.) The *Bellah* court answered the first question as follows: "Here, the complaint alleged the existence of a psychiatrist-patient relationship between defendant and [decedent], knowledge on the part of the defendant that [decedent] was likely to attempt suicide, and a failure by defendant to take appropriate preventive measures. *We are satisfied that these allegations are sufficient to state a cause of action for the breach of a psychiatrist's duty of care towards his*

*University of California, supra,* 17 Cal.3d 425, 436-437). The relation of the nontherapist or pastoral counselor to his counselee contains elements of trust and dependence which closely resemble those that exist in the therapist-patient context. Defendants here patently held themselves out as competent to counsel the mentally ill, and Nally responded to these inducements, placing his psychological and ultimately his physical well-being in defendants' care. Whether defendants adequately fulfilled their responsibilities to Nally is a separate question to which I will turn in a moment. That defendants had some responsibilities to fulfill, however, is not, in my view, open to question.

Nor is the nature of defendants' duty to Nally especially difficult to perceive. As in every negligence case, the precise nature of the defendant's duty will necessarily vary with the facts. (*Tarasoff* v. *Regents of University of California, supra,* 17 Cal.3d at p. 439.) In each instance, the adequacy of the nontherapist counselor's conduct must be judged according to what is reasonable under the circumstances. (*Ibid.*) Where, as here, defendants have invited and engaged in an extensive and ongoing pastoral counseling relationship with an individual whom they perceive to be suicidal, both reason and sound public policy dictate that defendants be required to advise that individual to seek professional medical care.

The point, which the majority persistently misperceives, is not that Pastors Rea or Thomson or anyone else should have known that Nally would, in fact, commit suicide. The point rather, is that the evidence, read in the light most favorable to plaintiffs, presents a triable issue as to whether defendants knew or should have known that suicide was a sufficient possibility to require that defendants advise Nally to seek competent medical care. Notwithstanding the majority opinion's conclusion to the contrary, the evidence in the record leaves no room for doubt on this question.

It has been suggested that both public policy and the constitutional right to the "free exercise" of religion militate against the recognition of a duty of care in these circumstances. I cannot agree.

The "policy" considerations most often mentioned are the possibilities that a duty of care "could deter those most in need of help from seeking treatment out of fear that their private disclosures could subject them to

---

patient." (*Id.* at p. 620, italics added.) My summary of the *Bellah* court's holding is accurate. A psychiatrist's duty is to take reasonable steps to prevent a patient's suicide. This does not imply, as the majority asserts, that a psychiatrist can guarantee his patients' safety. On the contrary, as Justice Mosk has observed, "psychiatric predictions of violence are inherently unreliable." (*Tarasoff* v. *Regents of University of California* (1976) 17 Cal.3d 425, 451 [131 Cal.Rptr. 14, 551 P.2d 334, 83 A.L.R.3d 1166] (conc. and dis. opn. of Mosk, J.).)

involuntary commitment to psychiatric facilities" (maj. opn. at p.297) or that such a duty could discourage "private assistance efforts." (Maj. opn. at p. 298.) Such concerns are unfounded. The scope of the duty contemplated is commensurate with the nontherapist counselor's background and stated mission. Unless he also happens to be a licensed therapist, his duty in most cases would not require disclosure of confidential communications, but would simply require that he advise the counselee to seek competent medical care.

Concerns about the possible exposure of counseling "hot lines" or even well-meaning friends to liability, are equally misplaced. There is simply no meaningful resemblance between such activities and the sort of counseling relationship at issue here.

Finally, it is urged that the imposition of a duty of care on defendants would unconstitutionally burden their First Amendment right to the free exercise of religion. There is no merit to this contention.

While the First Amendment bars the government from "prohibiting the free exercise of religion," religiously motivated *conduct* "remains subject to regulation for the protection of society." (*Cantwell* v. *Connecticut* (1940) 310 U.S. 296, 303-304 [84 L.Ed. 1213, 1218, 60 S.Ct. 900, 128 A.L.R. 1352]; accord *Molko* v. *Holy Spirit Assn.* (1988) 46 Cal.3d 1092, 1112-1113 [252 Cal.Rptr. 122, 762 P.2d 431].) However, it should be noted that defendants here do not claim that their religious principles prohibit resort to psychiatric counseling or the use of antidepressant drugs, nor do they claim that their religious beliefs prohibit a pastoral counselor from advising a counselee to seek psychiatric care. On the contrary, the record shows that defendants not only acquiesced in, but on occasion recommended such treatment.

Thus, defendants do not contend that a psychiatric referral itself violates their religious beliefs. They contend, rather, that the imposition of tort law duties in general creates an impermissible "burden" on religious liberty. Where the interest is sufficient, however, it is well settled that government may as readily *compel* religiously prohibited conduct as prohibit religiously motivated acts. (See *United States* v. *Lee* (1982) 455 U.S. 252, 261 [71 L.Ed.2d 127, 134-135, 102 S.Ct. 1051] [court upheld federal law requiring that Amish violate the tenets of their faith by participating in the Social Security system]; *Jacobson* v. *Massachusetts* (1905) 197 U.S. 11, 39 [49 L.Ed. 643, 655, 25 S.Ct. 358] [court upheld law requiring the vaccination of children despite parental religious objections].) Accordingly, courts, including our own, have determined that religious groups may be held liable *in tort* for their actions (*Molko* v. *Holy Spirit Assn., supra,* 46 Cal.3d 1092),

even where they occur in the context of religiously motivated counseling. (See, e.g., *O'Neil* v. *Schuckardt* (1986) 112 Idaho 472 [733 P.2d 693, 699-700] [church may be held liable for invasion of privacy resulting from marital counseling]; *Bear* v. *Reformed Mennonite Church* (1975) 462 Pa. 330 [341 A.2d 105, 107] [action for interference with marriage and business relations permitted where church ordered "shunning" of former member]; *Carrieri* v. *Bush* (1966) 62 Wn.2d 536 [419 P.2d 132, 137] [court allowed action for alienation of affections where church pastor counseled woman to leave her husband who was "full of the devil"].) As the court explained in *Carrieri*: "Good faith and reasonable conduct are the necessary touchstones to any qualified [First Amendment] privilege that may arise from any invited and religiously directed family counseling, assistance, or advice." (419 P.2d at p. 137.)

We need not go as far as these courts in sanctioning tort recovery for conduct which was *religiously motivated*. The intrusion in this case (i.e., the duty to advise a suicidal counselee to seek medical care) is religiously *neutral*. Defendants are not exposed to liability for refusing to counsel contrary to their religious beliefs or for affirmatively counseling in conformity with their beliefs. Thus, the burden on religion is relatively minimal.

The governmental interest, on the other hand, is compelling; society's interest in preserving the life of a would-be suicide is as profound as its interest in preserving life generally. To this end, society surely may require a pastoral counselor who invites and undertakes a counseling relationship with an individual in whom he recognizes suicidal tendencies, to advise that individual to seek competent medical care.

Thus, I am persuaded, on the facts presented, that defendants owed a minimal duty of care to Nally. I am equally persuaded, however, that defendants fulfilled their duty.

The facts in this regard are adequately stated in the majority opinion and need not be retold here. Although defendants were aware of Nally's suicidal tendencies and continued to offer counseling, they were also aware that he had been hospitalized as a result of an earlier suicide attempt, had seen a psychiatrist while in the hospital and been given a strong antidepressant drug. The record shows that defendants were not only aware that Nally was under the intermittent care of medical doctors, including a psychiatrist, but affirmatively advised him on several occasions to seek medical care. Moreover, Nally's psychiatrist, Dr. Hall, testified that he had examined Nally in the hospital and had advised his parents to have him committed. Dr. Hall, however, refrained from initiating involuntary commitment proceedings.

Therefore, as the trial court expressly found, the evidence shows that defendants neither breached their duty to Nally, nor contributed in any causally significant respect to his suicide.[9] For these reasons, I conclude that the Court of Appeal erred in reversing the judgment of nonsuit and dismissal of the action.

Accordingly, I concur in this court's judgment.

Broussard, J., concurred.

---

[9] The absence of breach or proximate cause does not, of course, preclude our holding that defendants nevertheless owed a minimal duty of care. (See fn. 7, *ante,* at p. 310.)