Filed 10/24/14

CERTIFIED FOR PARTIAL PUBLICATION[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION TWO

AMERIGAS INC.,

      Cross-complainant and Appellant,

v.

LANDSTAR RANGER, INC.,

      Cross-defendant and Respondent.

E056989

(Super.Ct.No. SCVSS131877)

OPINION

APPEAL from the Superior Court of San Bernardino County. John M. Pacheco, Judge. Affirmed.

Law Offices of Fletcher, White & Adair and Paul S. White for Cross-Complainant and Appellant.

Snyder Law, Barry Clifford Snyder and Adrian T. Lambie for Cross-Defendant and Respondent.

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part V.

# I

## INTRODUCTION

This action arises from a propane tank falling on truck driver, Steven K. King (King), while an AmeriGas Propane, L.P. (AmeriGas) employee, David Jones (Jones), was unloading empty propane tanks from King's flatbed trailer at an AmeriGas facility. Landstar Ranger, Inc. (Landstar), a motor carrier, had hired King and his company, King Transportation, LLC, to transport the load of propane tanks. King and his wife, Grace King, (the Kings) brought a personal injury action against shipper, AmeriGas, and carrier, Landstar, for damages for injuries arising from a propane tank falling on King. AmeriGas settled with the Kings and cross-complained against Landstar for equitable indemnification and contribution.[1] Following a bench trial on AmeriGas's cross-complaint, the trial court found Landstar not liable for equitable indemnification. The court concluded AmeriGas did not sustain any recoverable loss or damages and Landstar was not liable for violating any Federal Motor Carrier Safety Regulations (FMCSRs).[2]

AmeriGas appeals from the judgment entered in favor of cross-defendant Landstar, following a bench trial on AmeriGas's cross-complaint for equitable indemnity. AmeriGas contends the trial court erred in finding Landstar did not owe a legal duty to King and did not suffer a recoverable loss. AmeriGas asserts that the trial court considered affirmative defenses which the trial court had previously stricken from

---

[1] Reference in this opinion to indemnification and indemnity will include contribution unless indicated otherwise.

[2] 49 Code of Federal Regulations.

2

Landstar's answer to AmeriGas's cross-complaint, and erred in not issuing a tentative decision before requesting proposed statements of decision and in failing to rule on material issues raised by AmeriGas's cross-complaint.  AmeriGas further argues the trial court's alternative findings of nonliability are incomplete, ambiguous, and not supported by substantial evidence.

We conclude substantial evidence supports the trial court's judgment in favor of Landstar, on AmeriGas's indemnity cross-complaint.  There was ample evidence supporting the court's findings that King was a highly experienced truck driver, qualified to transport AmeriGas's propane tanks.  Therefore Landstar was not negligent based on violations of FMCSRs requiring carriers to ensure their drivers are adequately trained and/or experienced in securing their loads, and adhere to proper securement methods and procedures.  Even if Landstar violated FMCSRs, any such violations did not proximately cause or contribute to King's injuries because the load of propane tanks was secure and stable during transit and upon arrival at AmeriGas's Fontana yard.  We also reject AmeriGas's objections relating to the trial court's statement of decision.  Any procedural errors were harmless, and the statement of decision was sufficiently thorough and clear in addressing the material disputed issues in this case.  The judgment is affirmed.

II

FACTS

The following summary of facts are taken from King's videotaped deposition testimony, which was introduced as evidence at trial, and from trial testimony.

3

King began driving farm agricultural harvest vehicles on his family's farm in Idaho when he was 11 or 12 years old. He drove a two-ton farm vehicle, which was the equivalent of a "ten wheel or tandem drive straight truck," used to haul bulk potatoes from the field to storage on the farm or to a local warehouse. By age 16, he was operating harvesting equipment. He also continued driving trucks and loading, unloading, and stacking loads. He loaded and tied down stacks of bales of alfalfa and straw onto a flatbed truck. He learned how to tie down loads from older workers. He worked 14 to 16 hours a day, seven days a week on the farm, driving farm vehicles, loading and tying down product onto trucks.

King continued to drive a truck for his father and neighbors until he and his wife began operating a farm in 1971. He operated his farm for 20 years. During that time he did a lot of truck driving. He drove "ten wheel straight trucks," which had a long flatbed trailer. He hauled produce and was responsible for securing loads on the flatbed trailer. During 20 years of operating his farm, he hauled thousands of loads tied down on a flatbed trailer, including farm equipment, such as tractors.

Because of the downturn in the economy, in 1992, King obtained a commercial driver's license to drive trucks on state roads, in order to supplement his farming income. Before that, he drove a semi-tractor/trailer locally for a neighbor, Nathan Good. In order to get his commercial license, King had to take a written test and driver's test using a truck. The written test included questions on loading flatbeds, tank loads, and bulk loads.

After King got his license, King hauled loads primarily on a flatbed trailer. His loads included bulk commodities, farm equipment, such as tractors, disks, cultivating

4

equipment, pipes, such as irrigation pipe and aluminum delivery pipe, farming sprinklers, and other items, which included items that would roll. He had hauled diesel tanks, which were primarily secured with chains. The tanks were four feet in diameter and 15 feet long. They were cylindrical and would roll if not tied down. He did not stack the tanks because stacking was not necessary since there was enough room on the flatbed trailer to lay the tanks side by side in a single layer.

About 1994, King bought a tractor and trailer. King also continued using Good's flatbed trailer. King hauled just about anything that could be hauled on a trailer, including oversized loads, hazardous loads, vehicles, farm equipment, and fuel and diesel tanks. King stated that there was no way someone could go to school and learn to tie down everything he had hauled because each day he hauled something different, in every shape and size. When he worked for Landstar, he primarily used a 48-foot step deck, which is "a flatbed trailer with a lower portion on the back three-fourths." Many of his loads were over eight feet high. When King was working as an independent contractor for Landstar, he hauled Amtrak loads of railroad axle wheel sets.

With regard to the accident, King testified he had previously hauled the type of large tanks involved in the subject accident but had not hauled as many at once in the configuration of his load hauled at the time of the accident. With regard to the load involved in the accident, AmeriGas's employees had loaded the tanks on his truck. King

put the dunnage[3] between the tanks and tied down the tanks with straps. The tanks were empty 280-gallon tanks, weighing seven to eight hundred pounds apiece. The only way to handle the tanks was with a boom truck. Placement of the dunnage for loading was "not rocket science," in King's estimation. Loading the propane tanks was very similar to loading many other things King had transported.

King worked as a commercial truck driver up until the subject accident. King had never been in an accident while driving a truck and did not recall any part of his loads falling off his trailer during transport. King never received any citations or tickets for not properly securing his loads, although on one occasion, while driving for Landstar, he received a warning for hauling a load of giant augers, in which one of the augers was half an inch over the edge of the trailer.

After talking to the owner of Landstar, Bill Denton, and his wife, Charmaine Denton, King submitted an application to work for Landstar as a truck owner-operator. At the time, King and his wife were members of a limited liability company, King Transportation LLC, and owned two tractors. One of the tractors he leased to Landstar, which was a condition of working for Landstar. King also took a written test of his knowledge and ability to secure and tie down loads. The purpose of the test was to determine if an independent contractor or owner-operator applicant had sufficient

---

[3] "Dunnage" is defined as "a loose packing of any bulky material put around cargo for protection." (Webster's New World Dictionary (3d college ed. 1988) p. 421.) King explained that "dunnage" was "primarily lumber, wood, . . . probably four inches by four inches or four inches by six inches" and two to 20 feet long. It could also be plywood sheets or two-by-fours, which he used to haul railroad axle wheel sets for Landstar.

6

knowledge of load securement and tie down procedures. If an applicant did not have sufficient knowledge, the applicant was required to take a tie down class taught by Landstar. King passed the test and therefore did not have to take the class. King also took and passed tests for a HAZMAT endorsement to transport hazardous materials, and for endorsements to transport tanks. King signed an owner-operator agreement finalizing the relationship between King Transportation LLC and Landstar. King participated in a two-day orientation for Landstar drivers.

When King arrived at AmeriGas's Northern California yard in Camino, AmeriGas employees loaded 30 propane tanks on King's flatbed trailer using a boom. The tanks had four attached feet and were placed in two layers. The feet of the bottom layer of tanks rested on the trailer deck. The feet of the second layer of tanks rested on the dunnage laid across the top of the bottom tank layer. The tanks could not roll because they were sitting on their feet. Additional dunnage extending beyond the feet of the upper layer of tanks would not have made the tanks any more stable or made any difference in securing the tanks because the tanks were resting on their feet. The two layers of tanks each had five rows of three tanks across. King secured the tanks by placing nylon straps over each section of tanks, with two straps over the bottom layer and two straps over the top layer. The AmeriGas foreman or yard manager, Chuck Vanderhoef, observed King secure the load and signed the bill of lading, indicating he was satisfied with the load. King believed the tanks were loaded properly, were transported securely, and were intact upon arrival at the Fontana yard. Upon arrival, the tanks remained tightly secured, in their originally loaded position.

7

King transported the load to Fontana, arriving the following morning on April 14, 2005. A boom truck was not available to off-load the tanks. It was at another location 30 to 40 minutes from the Fontana yard. King asked AmeriGas employee, David Jones, how he intended to unload the tanks. Instead of retrieving the boom, Jones used a Spyder forklift, which Jones said was not normally used to unload tanks. Jones said he did not know how it would work but would try using it. It was not King's responsibility to unload the tanks. King told Jones to do whatever he had to do to unload AmeriGas's tanks, because King wanted to leave.

When Jones began unloading the tanks, King had completed transporting the tanks to AmeriGas's Fontana facility. King removed one of the two straps for each of the five sections, leaving one strap on each section. King intended not to release the second straps until the particular section was being unloaded. When King suggested this, Jones told him, "'No. Take them all off or we won't start unloading because we're going to unload layers.'" Jones was going to unload the entire top layer first. King did as he was told and removed all of the straps, since Jones was in charge and King was unable to unload the tanks himself.

After King removed all of the straps, King stood next to the front, left side of the trailer. Jones was on the same side, next to the left, rear corner of the trailer, operating the lift machine which was being used to lift and remove the tanks. King saw the machine abruptly lift up the left rear end of his flatbed trailer six to eight inches. This shook the trailer. The operator readjusted the machine and reapproached the trailer and repeated contact with the trailer. King did not remember anything after that.

8

King testified that the load was his responsibility while transporting it on the road and AmeriGas's responsibility after the load entered AmeriGas's yard and King set the brake on his truck. It was King's responsibility to remove the straps securing the tanks when safe to do so. The receiver of the load was responsible for safely off-loading the transported product because the receiver had the necessary equipment for off-loading. King believed he had sufficient knowledge and experience to load, secure, and unload the propane tanks properly. Jones did not properly off-load the tanks. He should have used a boom truck instead of a Spyder forklift. Off-loading was not King's responsibility.

King believed he followed all applicable FMCSRs when he was at the AmeriGas yard in Northern California, and was not aware of any FMCSRs applicable to unloading cargo. FMCSRs did not apply when he was no longer on a public throughway and was on private property.

During the trial, Charles Vanderhoef, operation plant supervisor at the Camino AmeriGas facility, testified an AmeriGas worker loaded the propane tanks onto King's flatbed truck with a boom truck. The truck driver, King, was responsible for securing the load and therefore strapped the tanks down. King used his own dunnage, instead of AmeriGas's dunnage. King told Vanderhoef he had never hauled the propane tanks before. King said he had normally hauled barbeque propane cylinders, which are on pallets.

Vanderhoef noticed one of the dunnage beams under the upper layer, front row of tanks, was shorter than the others, leaving three or four inches of the beam extending from the end of the beam to the tank. Vanderhoef assumed King knew to block the tanks

9

with chocks when he unloaded the tanks. Vanderhoef claimed the tanks were never loaded with the tank feet on the dunnage because the feet can slip off the dunnage. Vanderhoef was certain AmeriGas loaded the tanks on King's truck with the tank bellies on the dunnage, not the feet. Chocks were used when the tanks were loaded on King's truck and then removed after each tank was secured with straps. When the tanks are unloaded, typically drivers leave one strap on each row and use chocks on the tanks not being removed.

Vanderhoef testified King followed all of Vanderhoef's instructions regarding loading the tanks. After the tanks were loaded and secured, Vanderhoef signed off on the shipping papers. Vanderhoef believed King's truck had been properly loaded and did not foresee any security or safety risks posed by the load. He did not believe that the shorter dunnage beam would be a problem or pose a threat when unloading the tanks.

AmeriGas's regional safety manager, David Artero, testified that AmeriGas hired motor carriers to transport AmeriGas's 250-gallon propane tanks on flatbed trailers. The tanks are approximately 31 inches in diameter and about seven feet long. They weigh about 475 pounds. Artero hired Landstar to ship the load of tanks King transported in April 2005. At that time, AmeriGas's safety manual did not address loading and unloading tanks from a flatbed trailer. The training AmeriGas employees received for loading and unloading tanks consisted of "hands-on training," in which more experienced employees showed less experienced employees how to load and unload. AmeriGas employees assisted in unloading because truck drivers do not have the necessary equipment.

10

Artero investigated the accident involving King. Artero concluded Jones should not have unloaded the tanks by himself because he had never done so before. During the unloading of the tanks, King should not have removed all of the straps securing the tanks and Jones should have made sure the tanks were blocked while removing the tanks. Jones also should not have allowed Marvin Clark, employed by Andrews Logistics, to assist in the unloading. Jones, Clark, and King should have been communicating with each other while unloading the tanks.

Artero testified that it was not unusual for AmeriGas's propane tanks to be transported with only straps securing the tanks and without blocks or chocks. When tanks were unloaded, however, the tanks normally would be blocked. Jones should have told King to use blocks or chocks when the tanks were unloaded. However, the only thing drivers are required to do when unloading AmeriGas tanks was to unstrap the tanks. AmeriGas relied on Landstar to provide qualified drivers who would follow safe securement and unloading procedures.

AmeriGas district manager, Marc Steinbuch, testified that right after he transported the boom truck over to the side of King's flatbed trailer for removal of the tanks, Marvin Clark waved at Steinbuch. Steinbuch went to the other side of King's trailer and saw King and a tank on the ground next to King. It appeared that the tank had fallen off the top layer of tanks, on the driver's side.

Jones testified that he was hired at AmeriGas as a yard technician. His responsibilities included repainting propane tanks and yard maintenance. He received training on refurbishing tanks and on how to operate a Spyder forklift, which he used

11

almost every day. On another occasion before King's accident, Jones had assisted in unloading tanks from a truck.

Jones testified that when King's truck arrived, Jones attempted to remove a tank with the forklift, instead of waiting for the boom truck. Jones pulled up next to the trailer with the forklift. Marvin Clark assisted him in hooking chains on the tank. Jones denied having a conversation with King about removing the second strap from the tanks. Jones did not tell King to remove all the straps or tell him, if he did not remove the second strap, Jones would not unload the tanks. King was in a hurry to unload the truck and go to another location. Jones removed the first tank on the top left, and returned with the forklift to remove the middle tank. Clark and Jones hooked up the tank and, when Jones attempted to raise the tank, the chain gave way and the tank fell down. It was possible he bumped King's truck tires with the forklift tires. He did not believe the forklift lifted the trailer 12 to 16 inches and then abruptly put the trailer down. After the tank dropped or the forklift bumped the trailer, Jones noticed King and a tank on the ground, with King unconscious.

III

PROCEDURAL BACKGROUND

The Kings filed a personal injury complaint against AmeriGas and Jones, alleging AmeriGas's employee, Jones, negligently unloaded tanks from King's truck, causing one of the tanks to fall on King and severely injuring him. AmeriGas cross-complained against Landstar for indemnification, contribution, and declaratory relief. AmeriGas added as a cross-defendant Clark's employer, Andrews Logistics, which later settled for

12

$150,000. The Kings settled their lawsuit against defendants AmeriGas and Jones for $3.375 million.

Landstar moved for summary judgment on AmeriGas's cross-complaint. The trial court granted Landstar's motion on the ground AmeriGas's cross-complaint was barred by the workers' compensation exclusive remedy doctrine because King was a Landstar employee. (*AmeriGas Propane L.P. v. Landstar Ranger, Inc.* (2010) 184 Cal.App.4th 981, 985 (*AmeriGas*).) AmeriGas appealed (first appeal), and this court reversed the summary judgment ruling, holding that there was a triable issue as to whether King was a Landstar employee under state law. This court also held that Landstar had not refuted in its summary judgment motion AmeriGas's negligence claim based on FMCSR violations. (*Ibid.*)

**Second Amended Cross-Complaint**

After AmeriGas prevailed on its first appeal and the matter was remanded to the trial court, AmeriGas filed a second amended cross-complaint (SACC) alleging two causes of action, (1) equitable indemnification and (2) contribution. AmeriGas's SACC alleges the following facts and violations.

On April 7, 2005, AmeriGas hired Landstar to transport a combination of thirty 250- and 288-gallon propane tanks from its facility in Camino, in northern California, to its yard in Fontana, California. Landstar assigned the load to Steven King to transport. Landstar knew or should have known, King had no experience transporting propane tanks or similar articles. Landstar never asked King if he had such experience. Landstar did not provide King with any safety information, warnings or procedures for loading,

13

securing or unloading propane tanks. King was a driver/operator acting within the course and scope of his agency with Landstar. King was required to lease his truck to Landstar in order to become a driver for Landstar. Under the truck lease agreement and under FMCSR section 376.12, Landstar assumed complete responsibility for the operation of King's truck.

On April 13, 2005, King arrived at the AmeriGas facility in Camino to pick up 30 propane tanks. He participated in and supervised the loading and securing of the tanks onto his step-deck (flatbed) trailer. King insisted on using his own dunnage for loading. The tanks were loaded in five rows, three across and two high. King placed two securement straps over the top of each row and both straps over the top row. As secured, King accepted the load for transportation.

On April 14, 2005, King arrived at the AmeriGas facility in Fontana with the propane tanks. He removed the 10 securement straps as AmeriGas employee, Jones, prepared to unload the tanks with a forklift. The jarring of the trailer caused a tank to roll off the trailer and strike King, causing him serious injury. At the time of the accident, King was standing next to the trailer, rolling the securement straps with a hand winder. He had already rolled four of the securement straps and was in the process of rolling the fifth strap when struck by the falling propane tank.

AmeriGas alleges the securement straps should not have been removed until the particular row of tanks was ready to be off loaded; the tanks should not have been unstrapped without chocking or blocking the tanks to prevent them from rolling off the trailer; Landstar failed to tell King not to stand next to the secured tanks while they were

14

being off-loaded; and Landstar did not tell King to make sure chocks were in place before removing securement straps from articles likely to roll. In addition, one of the dunnage beams used to support the top layer of propane tanks was only 77 inches in length, instead of the standard 96 inches.

Several times a week, a Landstar affiliate company conducted a course on cargo securement on flatbed trailers. The course was intended to ensure that Landstar drivers operating flatbed trailers were properly trained to secure cargo on flatbed trailers. Landstar assumed a duty to ensure its drivers were properly trained to transport whatever loads Landstar assigned to them. Landstar was negligent in allowing King to transport loads without participating in its cargo securement course and without ensuring that King had adequate training and experience.

AmeriGas alleges that Landstar violated the following FMCSRs 376.12, 390.11, 391.13, 392.9, 393.104 (d), and 393.106 (c). AmeriGas further alleged that Landstar owed a legal duty to ensure the trailer was possessed, controlled, used and operated in accordance with standard safety procedures and regulations; Landstar negligently breached this duty; the breach was a legal cause of King's injuries and damages; and AmeriGas therefore was entitled to indemnification for the amount it paid King.

**Trial on the SACC**

After a three-day bench trial on AmeriGas's SACC, the trial court requested the parties to submit closing argument in writing, along with a proposed statement of decision. The court held in its amended statement of decision (referred to hereafter as the statement of decision), which adopted Landstar's proposed statement of decision, that

15

"Ameri[G]as is unable to demonstrate any damage or loss for which it can recover from Landstar and that no FMCSRs apply to the facts of this case. Therefore, Landstar cannot be liable under any theory relying on a violation of the FMCSRs. Even if Ameri[G]as has provable damages and even if Landstar had independent negligence manifesting itself separate and apart from that of Steven King, Landstar's full comparative fault is not more than 1% of that attributed to Ameri[G]as." AmeriGas appeals the defense judgment.

IV

NO LIABILITY BASED ON FMCSR VIOLATIONS

AmeriGas argues that it is entitled to equitable indemnification from Landstar based on the theory that Landstar violated FMCSR section 391.13 which mandates that carriers, such as Landstar, ensure that theirs drivers are adequately trained or have sufficient experience to transport cargo safely. AmeriGas asserts that Landstar did not ensure that King was sufficiently familiar with proper methods and procedures for securing a load of AmeriGas propane tanks on his flatbed trailer. Landstar claims King had no training or experience transporting propane tanks and was not familiar with proper methods and procedures for securing the tanks. As a consequence, the tanks were not properly secured and King transported the tanks in violation of FMCSR section 393.106(c)(1). AmeriGas argues King inappropriately removed all the securement straps, rather than waiting until the tanks were secured with chocks, wedges or in cradles. He also should have left at least one strap securing each row of tanks, with the exception of the particular row that was being unloaded. AmeriGas contends that as a consequence of

16

King not safely loading and unloading the propane tanks, the load was dangerously unstable, resulting in a tank falling off King's truck and injuring King.

## A. Law of the Case

AmeriGas contends the trial court erred in not applying the law of the case determined in the first appeal (*AmeriGas, supra,* 184 Cal.App.4th 981). As explained in *Bell v. Farmers Ins. Exchange* (2004) 115 Cal.App.4th 715, 727, "the reconsideration of a prior appeal is ordinarily precluded by the law-of-the-case doctrine. 'Under this doctrine, "the decision of an appellate court, stating a rule of law necessary to the decision of the case, conclusively establishes that rule and makes it determinative of the rights of the same parties in any subsequent retrial or appeal in the same case." [Citation.]' [Citations.]" (*Bell,* at p. 727; quoting *Nally v. Grace Community Church* (1988) 47 Cal.3d 278, 301-302.)

During the trial on AmeriGas's equitable indemnity cross-claim after remand, the trial court determined that Landstar did not owe a duty as a matter of law. AmeriGas argues the trial court's ruling violates the law-of-the-case doctrine because this court held in the first appeal that Landstar owed a legal duty under the FMCSR. In support of this contention, AmeriGas quotes the following language from *AmeriGas, supra,* 184 Cal.App.4th at page 996: "Looking to the pleadings, we conclude that AmeriGas has adequately alleged the alternative theory that Landstar violated the FMCSR. AmeriGas alleges in the FACC that King's injuries were caused, not only by his own acts, but also by Landstar's violations of various provisions of the FMSCR, including safety regulations requiring Landstar to train King on how safely to load and unload gas tanks

17

transported on a flatbed trailer. AmeriGas alleges that the FMSCR violations caused or contributed to King's injury." (*Id.* at p. 996.) We state here that AmeriGas sufficiently alleged a viable theory of recovery based on FMSCR violations.

In *AmeriGas, supra,* 184 Cal.App.4th 981, we denied AmeriGas's summary judgment motion in part "because AmeriGas's alternative theory of liability based on Landstar violating the FMCSR was not addressed or refuted in Landstar's summary judgment motion." (*Id.* at p. 994.) Relying on *Johnson*, we concluded in *AmeriGas* that King had a right to seek recovery against Landstar for any violations of FMCSRs by Landstar: "As in *Johnson* [*v. S.O.S. Transp.* (1991) 926 F.2d 516], in the instant case, we conclude King, as a driver, is an intended beneficiary of the FMCSR, and therefore AmeriGas can seek recovery against Landstar for violating regulations that caused or contributed to King's injury." (*Id.* at p. 1001.) We therefore held that, "[b]ecause a triable issue exists as to whether King was an employee under state law, and because AmeriGas alleged a viable claim under the FMCSR, we conclude the trial court erred in granting Landstar's summary judgment motion on AmeriGas's FACC." (*Ibid.*)

The trial court's subsequent trial findings and rulings rejecting AmeriGas's cross-claim for equitable indemnity do not conflict with this court's decision in *AmeriGas*. This court did not determine whether AmeriGas could prevail on its cross-claims founded on Landstar violating FMCSRs. We merely stated that AmeriGas had sufficiently alleged a claim founded on Landstar violating FMCSRs, and Landstar had not addressed the claim in its summary judgment motion. The trial court's subsequent findings and judgment do not contradict our holding in *AmeriGas*.

18

AmeriGas argues the trial court's finding that Landstar did not owe a duty violated the law-of-the-case doctrine because this court in *AmeriGas* impliedly found that Landstar owed a legal duty by overturning Landstar's summary judgment motion. However, the trial court concluded based on the evidence presented at trial that Landstar did not owe any duty to King for any FMCSR violations because King was injured after transit was completed, while the tanks were being unloaded. The trial court stated in its statement of decision that it found "no relevant FMCSR applies to the facts of this accident, the transit of the cargo having been completed well before the accident."

In the first appeal, this court, as well as the parties, did not address the issue of whether the duty under the FMCSRs extends to posttransit unloading of cargo. As stated in a footnote in our decision in *AmeriGas, supra,* 184 Cal.App.4th at page 1001, footnote 4, "At oral argument, Landstar for the first time asserted that AmeriGas's statutory claim, based on violations of the Act and FMCSR, did not constitute a viable cause of action because the truck was not in transit at the time of the accident. Landstar did not cite any authority supporting this proposition. In addition, Landstar cited for the first time three federal out-of-state cases in support of the proposition that there was no private cause of action under the Act and FMCSR. [¶] 'As a general rule, "issues not raised in the trial court cannot be raised for the first time on appeal." [Citation.]' [Citations.] Also, '[a]bsent a sufficient showing of justification for the failure to raise an issue in a timely fashion, we need not consider any issue which, although raised at oral argument, was not adequately raised in the briefs.' [Citation.] Furthermore, when counsel asserts a point but fails to support it with reasoned argument and citations to authority, the court may

19

deem it to be forfeited, and pass it without consideration.  [Citation.]  [¶]  We do not consider Landstar's new arguments because Landstar did not raise them either in the trial court or in Landstar's respondent's brief on appeal.  Landstar also did not provide this court or AmeriGas with any notice before oral argument that Landstar intended to rely on the newly cited cases.  We are not aware of any justification for Landstar's failure to raise the new issues and additional cases in a timely fashion."

The trial court therefore did not violate the law-of-the-case doctrine by finding there was no duty of care under the FMCSRs after completion of transit of the load of tanks, because we did not address the issue in *AmeriGas*.  We did not address the scope of the FMCSRs allegedly violated or their application.  This court merely held summary judgment was inappropriate because Landstar did not address in its summary judgment motion AmeriGas's alleged indemnity claim founded on Landstar's violation of FMCSRs.

## B.  Applicable Indemnity Law

AmeriGas contends the trial court has improperly intertwined issues of duty, causation and damages.  This error, AmeriGas argues, is reflected in the following language in trial court's statement of decision:  "as a matter of law this court finds that Ameri[G]as has suffered no compensable damage. . . .  Therefore, as a matter of law this court concludes that not only does Ameri[G]as not have any actual loss or recoverable damages but that, under the facts presented to this court, Landstar did not owe any duty to King for violations of FMSCRs."

20

AmeriGas argues that the trial court erroneously found that AmeriGas suffered no recoverable loss. The trial court based its finding on the ground Landstar did not owe a duty, since (1) Landstar was not responsible for the manner or method King transported the load because King was an independent contractor, (2) under *Diaz v. Carcamo* (2011) 51 Cal.4th 1148 (*Diaz*), there was no recoverable loss, and (3) the FMCSRs do not apply to unloading once transit is complete.

Although this court may not agree entirely with the trial court's reasoning in reaching a defense judgment in favor of Landstar on AmeriGas's SACC for indemnity, the applicable law and substantial evidence supports the trial court's finding of nonliability. AmeriGas asserts in its cross-complaint against Landstar that Landstar is liable for King's injury based on Landstar's own wrongful acts, independent from those of King. AmeriGas contends Landstar therefore must indemnify AmeriGas for Landstar's percentage of fault and reimburse AmeriGas for that percentage of the total settlement proceeds AmeriGas paid to the Kings.

"It is well established that the right to indemnity flows from payment of a joint legal obligation on another's behalf. [Citations.] Before the enactment of Proposition 51, a defendant who settled the plaintiff's entire claim was entitled to seek indemnification from concurrent tortfeasors for its payment of their joint obligation to the plaintiff. [Citations.] Now, however, joint liability is restricted to economic damages, and the right to seek indemnity after settlement is correspondingly limited. [Citation.]" (*Union Pacific Corp. v. Wengert* (2000) 79 Cal.App.4th 1444, 1448.) Under Proposition 51, "In any action for personal injury, . . . based upon principles of comparative fault, the liability

21

of each defendant for non-economic damages shall be several only and shall not be joint. Each defendant shall be liable only for the amount of non-economic damages allocated to that defendant in direct proportion to that defendant's percentage of fault, and a separate judgment shall be rendered against that defendant for that amount." (Civ. Code, § 1431.2, subd. (a).)

AmeriGas's indemnification claim is founded on negligence allegations Landstar violated FMCSRs, which caused or contributed to King's injuries. AmeriGas alleges Landstar violated the following FMCSRs: Sections 390.3 (general applicability of FMCSRs), 390.11 (motor carrier to require observance of driver regulations), 391.13 (responsibility of drivers), 392.9 (cargo securement), 393.104(d) (cargo securement devices and systems standards), and 393.106(c) (requirements for securing articles of cargo).

## C. Substantial Evidence Refuting Negligence Based on FMCSR Violations

FMCSRs establish minimum safety standards required of all trucks in interstate commerce. FMCSR violations by a carrier may support a finding of breach of a carrier's duty owed to its truck drivers, regardless of whether a truck driver has been retained under contract as an independent contractor or employee. (*AmeriGas, supra,* 163 Cal.App.4th at pp. 996-997.) Here, AmeriGas alleges in its SACC that AmeriGas is entitled to equitable indemnity from Landstar based on the negligence theory that Landstar's FMCSR violations created an unreasonably dangerous condition which resulted in King's injury. In proving liability based on FMCSR violations, AmeriGas bears the burden of proving, not only the primary negligence elements of duty of care and

22

breach of duty, but also causation, and damages. (*Jolly v. Eli Lilly & Co.* (1988) 44 Cal.3d 1103, 1123.)

As AmeriGas argues, AmeriGas's indemnification claim is not premised on King's acts of negligence or his violations of FMCSRs but, rather, is premised on Landstar's independent acts of violating FMCSRs requiring Landstar to ensure that its drivers, including King, are properly trained and knowledgeable of methods for securing and transporting loads assigned to Landstar truck drivers.

### (1) *Diaz, supra,* **51 Cal.4th 1148**

AmeriGas argues the trial court, relying on *Diaz, supra,* 51 Cal.4th 1148, incorrectly found that Landstar did not owe a duty because there was no recoverable loss. The trial court in the instant case stated in its statement of decision that, "In *Diaz*, the California Supreme Court concluded that to 'assign to the employer a share of fault greater than that assigned to the employee whose negligent driving was a cause of the accident would be an inequitable apportionment of loss.' (*Diaz, supra* at 455 and 1160). The same is true here, where AmeriGas seeks to assign to Landstar (as the employer) a share of fault greater than that assigned (and clearly taken into account during settlement negotiations) to King (as the employee)." This finding assumes, as stated in the trial court statement of decision, that there was "no independent conduct of Landstar which manifested itself other than through King." The trial court noted, "This is not a situation where, as the *Diaz* opinion points out, the employer may be liable for negligence independent of the employee. (*Diaz, supra* at 453, fn. 1 [*Diaz, supra,* 51 Cal.4th at p. 1160, fn. 1].) Here, Landstar did not negligently participate in any way in which its

23

conduct manifested itself other than through decisions and conduct of King. All of the potential liability of Landstar is vicarious and was considered and eliminated with the reduction of potential comparative negligence of King. Thus, as a matter of law, there exist no damages for which AmeriGas can seek recovery."

However, AmeriGas is not basing its indemnity claim on King's negligent conduct. AmeriGas seeks indemnification based on Landstar's independent negligent acts of violating FMCSRs requiring carriers to ensure that their truck drivers are properly trained or have adequate experience in securing cargo and qualify to transport assigned cargo. The issue here on appeal is whether the evidence and law support the trial court's finding that Landstar was not independently negligent based on FMCSR violations and whether any FMCSR violations by Landstar substantially caused or contributed to King's injury.

**(2) Applicability of FMCSRs to Unloading**

AmeriGas contends the trial court erred in finding Landstar did not owe a duty under the FMCSRs because the FMCSRs do not apply to unloading, once transit of cargo is complete. AmeriGas relies on FMCSR sections 390.3, 390.11, 391.13, 393.104(d), and 393.106(c)(1), which require a carrier to ensure its drivers have adequate training or experience in securing loads on their trucks and that the carrier ensures its drivers adhere to proper securement methods and procedures. These regulations do not address unloading cargo. They concern loading cargo so that it can be transported safely and not endanger the public or truck drivers during transport on public highways.

24

AmeriGas argues that the FMCSRs regarding proper securement of loads apply to unloading, as well as loading, because it is foreseeable that the load will shift during transport if not secured properly. If the load shifts, it will be unstable and pose a danger when unloaded. In support of the proposition the FMCSRs apply to unloading cargo, AmeriGas cites the following interpretation ("guidance") of FMCSR section 390.3 by the Federal Department of Transportation, Federal Motor Carrier Safety Administration (FMCSA):

> "Question 16:
>
> "a. Are vehicles which, in the course of interstate transportation over the highway, are off the highway, loading, unloading or waiting, subject to the FMCSRs during these times?
>
> "b. Are vehicles and drivers used wholly within terminals and on premises or plant sites subject to the FMCSRs?
>
> "Guidance:
>
> "a. Yes.
>
> "b. No."[4]

FMCSA's guidance question No. 16 and responses to subparts a and b do not apply to the facts in the instant case because, in the instant case, King's injury during unloading did not occur "in the course of interstate transportation over the highway."

---

[4] FMCSR 390.3, "Guidance" interpretation provided by the FMCSA at http://www.fmcsa.dot.gov/regulations/title49/b/5/3?reg=390.3&guidance=Y (as of Oct. 22, 2014).

Jones was unloading King's truck after it had arrived at the AmeriGas yard in Fontana. FMCSR section 390.3 concerns the general applicability of the FMCSRs. Although it does not expressly exclude application of the FMCSRs to unloading, there do not appear to be any FMCSRs which directly address unloading trucks after completing transit of a load. Subpart a of question No. 16, regarding FMCSR section 390.3, pertains only to unloading occurring in the course of interstate transportation over the highway, before a truck has reached its destination. Subpart b only applies to vehicles used solely at the delivery site and not for transportation over a highway. FMCSR guideline responses to question No. 16, subparts a and b, therefore do not support AmeriGas's contention that the FMCSRs are applicable in the instant case to unloading King's truck at AmeriGas's Fontana yard.

Also in support of the proposition the FMCSRs apply to unloading trucks, AmeriGas cites testimony by AmeriGas's expert, Kerry Nelson, that a truck driver has a responsibility to ensure that "nothing unsafe happens to the cargo that is on his trailer." AmeriGas also cites Landstar's operating agreement and lease agreement between Landstar and King which provides that the independent contractor (King) will be responsible for loading and unloading his shipments transported at the independent contractor's expense, unless otherwise specified. Although Nelson's testimony and the operating and lease agreements may support a finding of duty of care by the truck driver (King), such evidence does not establish that the FMCSRs encompass posttransit unloading of King's truck.

26

The trial court concluded that unloading cargo in a private yard after completing transit of a load is not governed by the FMCSRs. We agree AmeriGas has not cited any FMCSRs that expressly address unloading a truck at its final destination (rather than "in the course of interstate transportation over the highway"[5]). There appears to be none, most likely because the primary purpose of the FMCSRs is to prevent accidents and injury to the public on the highway. (*Tuscan/Lehigh Dairies, Inc.* (July 27, 2009) 22 O.S.H.C. (BNA) 1871 at pp. 62, 66-67.)

**(3) FMCSR Violations**

AmeriGas argues that, nevertheless, Landstar's violation of FMCSRs mandating carriers ensure drivers are qualified and have adequate training or experience in securing their loads, supports a finding of negligence liability because it is reasonably foreseeable an unstable, improperly secured load will result in harm when unloaded. But even assuming it is reasonably foreseeable that such FMCSR violations would result in injury when unloading an unstable load, in the instant case there was substantial evidence presented at trial supporting the trial court's findings that Landstar complied with all relevant FMCSRs (FMCSR §§ 390.3, 390.11, 391.13, 392.9, 393.104(d), and 393.106(c)).

In reviewing the trial court judgment and findings, this court thus must determine whether there was substantial evidence supporting the trial court's findings that there

---

[5] FMCSR 390.3, "Guidance" interpretation provided by the FMCSA at www.fmcsa.dot.gov/rules-regulations/administration/fmcsr/fmcsrruletext.aspx?reg=390.3&guidance=Y.

were no FMCSR violations and, if there were such violations, they did not substantially cause or contribute to the accident. (*Green Trees Enterprises, Inc. v. Palm Springs Alpine Estates, Inc.* (1967) 66 Cal.2d 782, 784 (*Green Trees*).) We apply the substantial evidence standard of review to the trial court's factual determination of whether Landstar violated the relevant FMCSRs and whether any of the violations proximately caused injury to King. (*Penny v. Wilson* (2004) 123 Cal.App.4th 596, 603.) "When a finding of fact is attacked on the ground that there is no substantial evidence to sustain it, the power of an appellate court *begins* and *ends* with the determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the finding of fact." (*Green Trees, supra,* 66 Cal.2d at p. 784.)

AmeriGas alleged in its SACC that Landstar violated FMCSRs requiring carriers to ensure its drivers have adequate training or experience in securing their loads on their trucks, that carriers ensure their drivers are qualified to transport their assigned loads, and that carriers require their drivers to adhere to driver regulations, including proper securement methods and procedures (FMCSR §§ 390.3, 390.11, 391.13, 392.9, 393.104(d), and 393.106(c)).

The trial court found, as a matter of law, that Landstar did not have any independent negligence other than through King, on the ground no FMCSRs applied to King's accident. The trial court further alternatively concluded that, in considering Landstar's comparative fault, Landstar's fault, if any, did not exceed one percent of that attributed to AmeriGas. In reaching this conclusion, the trial court found that AmeriGas's employees were responsible for loading the tanks on King's flatbed trailer

28

and King was responsible for ensuring the weight distribution was appropriate and the load was adequately secured for transportation. Although there was evidence the dunnage beam supporting the tank that fell was shorter than the other beams, there was substantial evidence that King experienced no problems transporting the load. The trial court therefore found that the load had been secured in compliance with FMCSRs relating to load securement.

With regard to unloading the tanks, the trial court concluded in its statement of decision that it was AmeriGas's responsibility to unload the propane tanks, and an unqualified AmeriGas employee, Jones, negligently attempted to unload the tanks using a Spyder forklift instead of waiting for the arrival of a boom truck. In addition, Jones allowed an unqualified third person, Marvin Clark, to assist in unloading the tanks and instructed King to remove all of the straps at once or Jones would not unload the tanks. Jones further failed to communicate with King or Clark regarding the unloading process and either bumped or lifted the flatbed trailer with the forklift, causing a tank to fall on King. The trial court also found that King was a very experienced truck driver and well qualified to load and secure the tanks properly. Based on all of the foregoing findings, the trial court concluded AmeriGas had failed to demonstrate any applicable FMCSR violations supporting a finding of liability against Landstar.

We conclude there was substantial evidence supporting the trial court's findings Landstar did not violate FMCSRs requiring it to ensure King had adequate training or experience in securing his load and ensure King was qualified to transport his assigned load, and adhered to all driver regulations, including complying with proper securement

29

methods and procedures (FMCSR §§ 376.12, 390.3, 390.11, 391.13, 392.9, 393.104(d), and 393.106(c)). Although King acknowledged he had not previously transported the particular type of propane tanks involved in the subject accident and had not taken Landstar's load securement class, there was substantial evidence that, when Landstar hired King, Landstar checked King's background and experience as a commercial truck driver. King was licensed, tested, and experienced in securing and transporting a vast variety of types of cargo, including items similar to the propane tanks.

King was an extremely experienced truck driver, with years of experience. King had been driving a truck throughout most of his life, beginning on his family's farm when he was 11 or 12 years old. In his early teens, he drove a truck primarily on his family's farm and for neighbors. He transported commodities and farm equipment. In 1992, he obtained a commercial truck driver's license and drove a truck daily in connection with his farming business. King purchased his own tractor in 1992 and a trailer in 1994. He also used his neighbor's flatbed trailer. In 2000, King worked for one year as a sole proprietorship hauling goods and then, in 2001, drove for Swift Transportation for five months. After that, he began working for Landstar as a commercial truck driver and drove full-time for Landstar until his accident in April 2005. During that time, King primarily drove his flatbed trailer.

AmeriGas argues that King's use of a 77-inch dunnage beam, instead of a 96-inch beam, and not using chocks or wedges to secure the tanks during transport demonstrated that Landstar had not properly trained King in load securement and allowed him to transport the load when he was not qualified to do so. While King may have been

30

negligent in this regard, there nevertheless was substantial evidence to support the trial court's findings that King was a highly qualified, knowledgeable truck driver, and sufficiently experienced to transport AmeriGas's propane tanks. Therefore Landstar did not violate any FMCSRs by allowing King to transport the load without additional training. The evidence was sufficient to support a finding there was no breach of any duty founded on FMCSRs mandating carriers ensure their drivers are qualified to transport assigned loads and properly trained or sufficiently experienced in appropriate securement methods and procedures.

### (4) Causation

There was also substantial evidence supporting the trial court's finding that, even if Landstar violated the relevant FMCSRs, such violations did not substantially cause or contribute to King's injury. In order to prevail on AmeriGas's indemnity claim, AmeriGas was required to establish Landstar's alleged FMCSR violations proximately caused or contributed to King's injury. AmeriGas had "the burden of proving a substantial causal relationship between the defendant's act or omission and the injury." (*Bookout v. State of California ex rel. Dept. of Transportation* (2010) 186 Cal.App.4th 1478, 1486; see also *Christensen v. Superior Court* (1991) 54 Cal.3d 868, 900 ["[a] plaintiff seeking to recover damages from a negligent defendant must allege a causal connection between the negligence and the plaintiff's injury"].)

Here, the trial court reasonably concluded the accident was not proximately caused by any FMCSR violations by Landstar, based on evidence the tanks were stable and secure when they left AmeriGas's Camino yard in Northern California, and the load was

31

transported to AmeriGas's Fontana yard in Southern California without incident. King testified Vanderhoef observed King secure the load in Camino and signed the bill of lading, indicating he was satisfied with securement of the load. King further testified the tanks were loaded properly, were transported securely, and were intact upon arrival at the Fontana yard. According to King, the tanks were tightly secured and in their originally loaded position, upon arrival.

Vanderhoef testified King followed all of his instructions regarding loading the tanks. After the tanks were loaded and secured, Vanderhoef signed off on the shipping papers. Vanderhoef believed the tanks were properly loaded and did not foresee any securement or safety risks posed by the load. He did not believe the shorter dunnage beam posed a problem or threat when unloading the tanks. Vanderhoef testified chocks were used when the tanks were loaded onto King's truck. He removed the chocks after each row of tanks was securely strapped down. After the tanks were all loaded, Vanderhoef concluded the load was stable for transport. Vanderhoef testified he assumed AmeriGas employees at the destination facility in Fontana would use new chocks before unloading the tanks, in accordance with AmeriGas procedures. Jones, however, did not chock the tanks at the Fontana facility or direct anyone else to do so.

AmeriGas's regional safety manager, David Artero, testified that it was not unusual for AmeriGas's propane tanks to be transported with only straps securing the tanks and without blocks or chocks. Artero, however, noted that when the tanks were unloaded, they should be blocked. The only thing drivers were required to do when unloading AmeriGas's tanks was to unstrap the tanks.

32

The evidence as a whole established that, when the tanks were loaded onto King's truck, they were secured with straps and the load did not shift during transport. Vanderhoef and King testified the load was secure and stable when it left AmeriGas's Camino yard in Northern California. There was no evidence that, when King removed all of the securement straps at the Fontana yard in Southern California, the load was unstable. After the straps were removed, Jones removed one tank from King's truck without incident. It was not until Jones attempted to remove a second tank, that a tank fell off the truck and injured King. When Jones bumped or lifted the trailer with the forklift, he dropped a second tank he was lifting with a chain, and a third tank rolled off the trailer and fell onto King. This evidence established that the tank became unstable, rolled off the truck, and fell onto King, not because of improper loading of the tanks, but because of Jones, King, and Clark's negligent acts unloading the tanks.

Jones, King, and Clark's negligent acts included the failure to reinsert chocks before removing the straps; removal of all of the securement straps at one time; Jones using a Spyder forklift, instead of a boom truck, and bumping the trailer or lifting it with the forklift; Jones allowing an unqualified third person to assist with the unloading; Jones not communicating with King during the unloading process; and King standing next to the trailer during unloading. The trial court reasonably concluded based on these facts that the accident was proximately caused by negligently unloading the tanks, not by the manner in which the tanks were loaded onto King's truck.

Because there was substantial evidence supporting the trial court's findings Landstar did not violate any applicable FMCSRs and, even if it did violate FMCSRs,

33

such violations did not proximately cause King's injuries, we need not consider AmeriGas's objections to the trial court's alternative findings that, in considering Landstar's comparative fault, Landstar's fault, if any, did not exceed 1 percent of that attributed to AmeriGas.

V

PROCEDURAL OBJECTIONS

AmeriGas asserts the trial court committed various procedural errors, none of which we view as constituting prejudicial, reversible error.

## A. Consideration of Stricken Affirmative Defenses

Following remand, after AmeriGas's first appeal, the trial court sustained without leave to amend AmeriGas's demurrer to Landstar's first affirmative defense (no private right of action), second affirmative defense (no duty), and eighth affirmative defense (no liability for acts of independent contractor), alleged in Landstar's answer to AmeriGas's SACC. During the hearing on AmeriGas's demurrer to Landstar's answer to the SACC, the trial court stated Landstar's affirmative defenses were not viable under *AmeriGas, supra,* 184 Cal.App.4th 981.

AmeriGas contends the trial court erred in deciding at trial issues raised in Landstar's stricken affirmative defenses. But AmeriGas has not established any prejudicial error, even assuming the trial court inappropriately considered the issues of whether there was a private action, duty, and liability for acts of an independent contractor. The outcome would have been the same. The trial court would have nevertheless found Landstar did not violate any relevant FMCSRs and, even if Landstar

34

did violate FMCSRs, there was substantial evidence that the alleged violations did not proximately cause King's accident.

## B. Undecided Material Issues

AmeriGas contends the trial court erred failing to issue a tentative decision under California Rules of Court,[6] rule 3.1590(a) and (f)[7], before requesting proposed statements of decision from the parties.  AmeriGas argues that as a consequence, the statement of decision fails to address material issues.

### (1) Procedural Background Relating to the Statement of Decision

Following a three-day bench trial on AmeriGas's SACC, the trial court requested the parties to submit closing argument in writing, along with a proposed statement of decision.  On November 23, 2011, the trial court filed a proposed statement of decision, which adopted Landstar's statement of decision.  On November 30, 2011, the court served the proposed statement of decision on the parties, along with a notice that the

---

[6] Undesignated rule references are to the California Rules of Court.

[7] Rule 3.1590(a) provides:  "On the trial of a question of fact by the court, the court must announce its tentative decision by an oral statement, entered in the minutes, or by a written statement filed with the clerk.  Unless the announcement is made in open court in the presence of all parties that appeared at the trial, the clerk must immediately serve on all parties that appeared at the trial a copy of the minute entry or written tentative decision."
Rule 3.1590(f) provides:  "If a party requests a statement of decision under (d), the court must, within 30 days of announcement or service of the tentative decision, prepare and serve a proposed statement of decision and a proposed judgment on all parties that appeared at the trial, unless the court has ordered a party to prepare the statement.  A party that has been ordered to prepare the statement must within 30 days after the announcement or service of the tentative decision, serve and submit to the court a proposed statement of decision and a proposed judgment. . . ."

35

decision would become the final statement of decision and judgment unless objected to within 15 days.

On December 9, 2011, AmeriGas filed an objection, complaining that the trial court had not provided a tentative decision before the court issued its proposed statement of decision. In addition, AmeriGas objected to not having an opportunity to formally request a statement of decision within 10 days after the court announced or served its tentative decision. AmeriGas further objected that it did not have an opportunity to respond to the court's proposed statement of decision. AmeriGas filed a request for statement of decision under rule 3.1590(d) and specified issues AmeriGas requested the trial court to address in its statement of decision. On December 14, 2011, AmeriGas filed objections to the proposed statement of decision.

The trial court conducted a hearing on AmeriGas's objections to the court's tentative statement of decision. The court thereafter made various minor, nonsubstantive revisions to its proposed decision, which incorporated Landstar's proposed decision, and adopted the revised decision as the final statement of decision.

### (2) Sufficiency of the Tentative Statement of Decision

Any technical, procedural error by the trial court in not fully complying with rule 3.1590(a) and (f) requirements to issue a tentative decision before requesting proposed statements of decisions, was harmless. The record reflects that the parties were given ample notice of the trial court's intended decision before it was issued and had an opportunity to address fully the proposed findings and judgment.

36

AmeriGas argues that, because the trial court did not issue a tentative decision before requesting proposed statements of decision from the parties, the issues raised in AmeriGas's request for a statement of decision were not addressed in the final statement of decision. For instance, AmeriGas complains that the trial court did not address (1) whether Landstar owed a duty under FMCSR section 391.23 and breached it by failing to investigate King's training and experience;[8] (2) whether Landstar owed a duty and breached it under FMCSR section 391.23 by failing to ensure King was familiar with proper methods and procedures for securing tanks; (3) whether Landstar owed a duty and breached it under FMCSR sections 391.104(d) and 393.106(c)(1) by failing to use proper methods and procedures for securing the tanks; (4) whether Landstar owed a duty and breached it under FMCSR section 376.12 by failing to ensure the equipment was possessed, controlled and used in a safe manner; and (5) whether these breaches caused or contributed to King's injuries.

The trial court's statement of decision adequately addresses each of these issues. The court clearly states its findings that, as a matter of law, Landstar did not commit any independent negligent acts and none of the FMCSRs applied to Landstar regarding King's accident. The trial court also stated it found that King's load of propane tanks had been secured in compliance with FMCSRs relating to load securement. With regard to FMCSRs regarding Landstar ensuring King was a sufficiently experienced truck driver and qualified to transport the load of propane tanks, the trial court states it found that

---

[8] We note AmeriGas does not cite FMCSR section 391.23 in its SACC.

King was extremely experienced and well qualified to load and secure the tanks properly. The trial court further states in the statement of decision that it concluded AmeriGas had failed to demonstrate there were any applicable FMCSRs supporting a finding of liability against Landstar. Because it is apparent from the trial court's statement of decision that the trial court considered and addressed all relevant issues, including those which AmeriGas complains were not addressed, we conclude any error in not issuing a tentative decision before requesting the parties to submit proposed statements of decision and any lack of specificity in addressing issues, was harmless error.

## VI

## DISPOSITION

The judgment is affirmed. Landstar is awarded its costs on appeal.

CERTIFIED FOR PARTIAL PUBLICATION

CODRINGTON
J.

We concur:

RAMIREZ
P. J.

MILLER
J.

38